**David N. BERKS, et al., Appellants,**

v.

**Gerald M. FINE, Respondent.**

**No. C9-87-375.**

Court of Appeals of Minnesota.

July 21, 1987.

David N. Berks, pro se.

R. Stephen Tillitt, Minneapolis, for respondent.

Considered and decided by NIERENGARTEN, P.J., and FOLEY and RANDALL, JJ., with oral argument waived.

### OPINION

NIERENGARTEN, Judge.

David Berks appeals the dismissal of his action with prejudice, and the denial of his motion to vacate the dismissal. We reverse.

### FACTS

David Berks sued Gerald Fine for alleged legal malpractice occurring in 1976. The pleadings were filed in September of 1982. Interrogatories were later served by Fine. In March 1985, Berks' attorney withdrew and Berks continued pro se.

Berks' deposition was taken by Fine in May of 1985 and in October of 1985, Fine moved for summary judgment. In April 1986 the court continued the summary judgment motion to June 23, 1986, at which time Berks was required to produce an expert witness or show cause why one was unavailable at that time. The court determined that in the absence of expert testimony, summary judgment would be appropriate. In May 1986 Berks received a notice from the court administrator that unless a note of issue/certificate of readiness was filed, or the case continued pursuant to motion and order by the assigned judge before July 1, 1986, the case would be subject to dismissal on July 1, 1986. The basis for this notice was Rule 4.03 of the Amended Rules of the Fourth Judicial District and Minn.R.Civ.P. 41.02. The June 23, 1986, hearing was continued sua sponte to July 14, 1986, because of a court scheduling problem.

On June 24, 1986, Berks moved for a continuance in order to respond at the summary judgment hearing scheduled for July 14, 1986. On June 26, 1986, the court issued an order which stated:

1. This case is continued beyond July 1, 1986.

2. This case is continued to allow Plaintiffs to respond to the Motion hearing on July 14, 1986 and to conduct discovery which will allow Plaintiffs to move forward with their action against Defendant.

On July 9, 1986, Berks filed a motion to proceed in forma pauperis and to substitute himself as the plaintiff instead of EJB Industries, Inc. At the July 14, 1986, summary judgment hearing, Berks introduced the affidavit of an expert witness as ordered to do so by the court. On August 4, 1986, the trial court granted Berks' motion for substitution of parties and his motion to proceed in forma pauperis. The defendant's motion for summary judgment was denied.

On September 30, 1986, with no notice, the court dismissed Berks' case, without prejudice, pursuant to Rule 4.03 of the

Amended Rules of the Fourth Judicial District, which states:

All cases will be automatically dismissed under Rule 41.02 without prejudice after 12 months from initial filing, unless a Note of Issue/Certificate of Readiness has been filed or the case has been continued.

On October 10, 1986, Berks moved to vacate the dismissal order but the motion was denied and judgment with prejudice was entered December 4, 1986. Berks appeals from this judgment.

## ISSUE

Did the trial court abuse its discretion in refusing to vacate the dismissal of appellant's case?

## ANALYSIS

■ Dismissal under Rule 41.02 is an exercise of the court's discretionary authority. The record is viewed in the light most favorable to the trial court's order and the dismissal will be sustained on appeal absent a clear showing of abuse of discretion. *Zuleski v. Pipella,* 309 Minn. 585, 586, 245 N.W.2d 586, 587 (1976).

■ This appeal arises from a dismissal under Rule 4.03 of the Rules of the Fourth Judicial District and Minn.R.Civ.P. 41.02. Special rule of practice 4.03 was amended in 1985 to implement a block assignment system in Hennepin County District Court. Chief Judge Fitzgerald issued an order dated April 10, 1985, which provided in part:

Cases filed with the Court prior to July 1, 1985, but not certified ready for trial, will be activated effective July 1, 1985, for the purposes of the initial filing date. All cases activated on this date will be dismissed on July 1, 1986, unless a Note of Issue/Certificate of Readiness has been filed or the case has been continued prior to the expiration of 12 months, under Rule 41.02, Rules of Civil Procedure.

*See* 1987 Minn.Rules of Court, at 500 (West 1987).

(1) The court may on its own motion, or upon motion of a party, and upon such notice as it may prescribe, dismiss an action or claim for failure to prosecute or

to comply with these rules or any order of the court.

\*     \*     \*     \*     \*     \*

(3) Unless the court in its order for dismissal otherwise specifies, a dismissal under this rule and any dismissal not provided for in this rule or in Rule 41.01, \* \* \* operates as an adjudication upon the merits.

Minn.R.Civ.P. 41.02.

District courts may adopt and implement local rules of practice.

Any court, other than the supreme court, may adopt rules of court governing its practice; \* \* \* judges of district court, \* \* \* may adopt rules not in conflict with the rules promulgated by the supreme court.

Minn.Stat. § 480.055, subd. 1 (1984). Special Rule 4.03 provides that a case will be dismissed *unless* a note of issue/certificate of readiness is filed or the case has been continued.

Berks received notice from the court that his case was subject to dismissal. When he realized the case would go beyond the July 1, 1986, deadline established by the rule, he moved for a continuance which was granted with no limitation on time or requirements, other than to continue discovery.

Berks continued with his discovery and the trial court heard and ruled on the motions before it in August 1986. Then, in September, Berks' case was suddenly dismissed pursuant to Minn.R.Civ.P. 41.02 with no other explanation. Unable to get an explanation for the dismissal, Burke moved to vacate. The motion was denied, again without explanation.

The trial court clearly abused its discretion. Although Berks filed his action just months before the statute of limitation ran and did very little after filing, he resumed activity on the case when Fine filed a motion for summary judgment in the fall of 1985. It took nine to ten months for the summary judgment motion to be heard. Berks responded to Fine's motion and procured the necessary expert witness. Berks complied with the requirements of Rule 4.03. The court continued to act on motions and the case appeared to be making progress.

While the delay prior to 1985 may have caused prejudice to Fine, he failed to show that any additional prejudice will result if the case is reinstated.

## DECISION

We find the trial court clearly abused its discretion first in dismissing appellant's case and then in denying his motion to vacate. We reverse on this basis and do not reach the constitutional issues raised by appellant.

Reversed.

STATE of North Dakota, Plaintiff
and Appellee,

v.

Calvin NEWNAM, Defendant
and Appellant.

Crim. No. 1195.

Supreme Court of North Dakota.

June 24, 1987.

Tom P. Slorby, States Atty., Minot, for plaintiff and appellee.

Kenner Law Firm, Minot, for defendant and appellant; argued by Carl O. Flagstad.

MESCHKE, Justice.

Calvin Newnam appeals from convictions of robbery, felonious restraint, and murder for killing Charles and Cora Abernathy on February 8, 1985, in their rural Minot home. Newnam contends that his statements to law enforcement officials on September 25, 26, 27, and 30, 1985, should not have been used as evidence because the officials' conduct made those statements involuntary. He also contends that results of polygraph examinations should have been admitted into evidence. We hold that the trial court correctly allowed Newnam's statements as evidence and correctly excluded the polygraph results from evidence. Accordingly, we affirm.

I

Before the Abernathy investigation, Newnam was arrested and had several contacts with police. After his arrest on November 2, 1982, Newnam was advised of his *Miranda*[1] rights, waived them, and confessed, resulting in his conviction for crimes unrelated to this case. Thus, Newnam was on probation during the Abernathy investigation.

Newnam's first contact with police about the Abernathy murders took place on February 15, 1985. He was with Kevin Austin at a Minot bank when Minot police arrested Austin on a forgery charge. Newnam agreed to voluntarily drive to the police station. At that time Newnam was advised of his *Miranda* rights, signed a written waiver of his rights, and was questioned about the murders for approximately twenty minutes. Newnam also signed a consent for the search of his automobile and home.

On February 18, 1985, Detective Clint Wolf of the Minot Police questioned Newnam. Newnam was again advised of his *Miranda* rights before being questioned and signed another acknowledgement and waiver of his rights. During this questioning, Newnam agreed to a polygraph examination.

Newnam signed additional consents and written waivers of his *Miranda* rights on February 23 and 26, 1985, when he underwent polygraph examinations by Lieutenant Donald Schneider. Schneider interpreted four of the results of the polygraph examinations as inconclusive and two of the results as establishing that Newnam was not being deceptive while answering questions about the murders.

On May 3, 1985, Sheriff's Deputies Vern Erck and Bob Bankes went to Newnam's house and discussed the Abernathy investigation with Newnam for about a half hour. According to Bankes, Newnam then agreed

to consult a psychologist; however, he later changed his mind.

On June 3, 1985, the police searched Newnam's residence with a warrant, but that search did not uncover any evidence about the Abernathy murders. On June 15, 1985, Deputies Erck and Bankes visited Newnam at his residence and discussed the matter for about one-half hour. During July and August police contacted Newnam on two or three more occasions.

On September 6, 1985, Newnam went to the Minot Police station at the request of Detective Keelan who testified:

"Q. What was discussed?

"A. Well, to talk. We made small talk. We talked about the credit cards. We talked about politics. We had talked about investments.

"And after I advised him of his rights, I directed questions to the Abernathy home site.

"Q. What were those questions?

"A. I asked him if he was involved and told him that there was obviously something on his mind by his nervousness that I thought he should come forth about the homicide.

"Q. Did he make a response?

"A. He started to cry. And said that there was something that he would like to tell me but couldn't.

"Q. Did the interview end then, end at that time?

"A. Yes, sir, it did.

"Q. Did he leave?

"A. Yes, sir, he did."

On September 20, 1985, Deputies Erck and Bankes and Probation Officer Loren Headrick visited Newnam at his place of employment and asked him to show them guns which he had stored at his father's house. Newnam agreed, but, after talking to a co-employee, he told the officers to get a warrant, and the guns were later seized with a search warrant.

1. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–707 (1966), outlined safeguards before a person may be subjected to "custodial interrogation":

"Prior to any questioning, the person must be warned that he has a right to remain silent,

that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

On September 24, 1985, Minot Police Officers John Glibota and Keelan contacted Newnam and asked him to come to the police station at 4:00 p.m. the next day. Newnam did so and was immediately informed that he was not in custody and that he was free to leave at any time. Near 4:20 p.m. on September 25, Officers Glibota and Keelan began talking to Newnam about his rental property, investments, stereo and other "small talk," and, about 6:30 p.m., they began discussing an unrelated burglary and the Abernathy murders. Officer Keelan testified:

"Q. When the interview turned to the Abernathy murders, did you observe any outward signs of nervousness or anything on the part of defendant?

"A. Yes, sir. He became nervous.

"Q. How was he nervous? What did you observe?

"A. Biting of the fingernails, his leg was moving around quite a bit, and he was squirming in the chair.

"Q. Did he show any signs of emotion at that time?

"A. He had become, like I say, extremely nervous.

"Q. He became what?

"A. Extremely nervous.

"Q. No, prior to that, what did you say back there? You said he became—and I didn't hear the word?

"A. I said squirming in his chair.

"Q. Was the [sic] tearful?

"A. No, sir.

"Q. What happened at that point?

"A. Well, he was shown the pictures. And he stated that, um, it was really a horror. And I said, yes, it was.

"And I said, 'You were there, Calvin.'

"And he said, 'Yes.'

"Q. What happened at that point?

"A. He was advised of his rights."

Newnam signed a document acknowledging that he had been advised of his *Miranda* rights and stated that he did not want to sign a waiver of those rights until the Ward County States Attorney was present. The interview was suspended from 6:45 p.m. until shortly after 8:00 p.m.

when the States Attorney arrived. Then Newnam acknowledged that he understood his *Miranda* rights and signed a written waiver of those rights. Newnam made a recorded statement implicating himself and an accomplice in the murders. That statement was transcribed on twenty-four pages which Newnam reviewed, corrected, and signed. Newnam was arrested for murder and taken to the Ward County Jail where two separate summonses were filled out, one for murder and one for detoxification.

According to officials, two summonses were used to avoid a public announcement of the arrest so that the accomplice could be confronted at the State Penitentiary before learning about Newnam's arrest. According to Glibota, Newnam was advised of the reason for two summonses and agreed to accompany officials to the State Penitentiary. On September 26, 1985, Newnam was taken to the State Penitentiary, but the confrontation ended when the accomplice asked to consult an attorney. During the trip to the penitentiary, Newnam made another recorded statement after being advised of his *Miranda* rights and signing a written waiver.

On Friday, September 27, 1985, Newnam was again advised of his *Miranda* rights and signed a written waiver. He then directed officers over the route taken after the Abernathy shootings, and a knife, jacket, and boots were found in the ditch along the route. Newnam identified those items with the shootings.

On Monday, September 30, 1985, Newnam was again advised of his *Miranda* rights and signed a written waiver. He then identified a lighter with "Austin" scratched on it which was found near the knife in the ditch.

Newnam appeared before a magistrate on September 30, 1985, and, at that time, he requested counsel. On October 1, 1985, Newnam was again advised of his *Miranda* rights, signed a written waiver, and made a recorded statement. On October 2, 1985, the court appointed counsel to represent Newnam.

Newnam moved to suppress his statements of September 25, 26, 27, 30, and

October 1, 1985. The State conceded that the October 1 statement should be suppressed because it was given after Newnam requested counsel. *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). The trial court suppressed the October 1 statement, but refused to suppress the September statements. Over Newnam's objections, his September statements were admitted as evidence in the trial by jury. Newnam was convicted and sentenced to consecutive life terms for the murders and concurrent terms of 20 years for robbery and 5 years for felonious restraint.

## II

### A

Our inquiry begins with Newnam's September 25 statement which he contends was illegally obtained because officers failed to give him a timely *Miranda* warning. Newnam asserts that the September 25 statement and all of his subsequent statements were tainted by that illegality and should have been suppressed.

The Fifth Amendment of our United States Constitution, as well as Sec. 12, Article I of our North Dakota Constitution, provides that no "person ... shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the prosecution may not use statements stemming from the "custodial interrogation" of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. (See fn. 1). The *Miranda* court defined custodial interrogation to mean "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. *See State v. Fields*, 294 N.W.2d 404 (N.D.1980).

In several decisions, the United States Supreme Court has elaborated on the definition of "custodial interrogation."

In *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the police unsuccessfully tried to contact the defendant, a parolee, on three or four occasions over a span of 25 days for questioning about a burglary. Finally, a police officer left his card at the defendant's apartment with a note asking the defendant to call him. The defendant called the officer the next day, and a meeting was arranged at the state patrol office. When the defendant arrived at the state patrol office he was told that he was not under arrest and was then taken to a separate room for an interview. The officer informed the defendant that the police suspected him of the burglary and that the truthfulness of any statement he made would be evaluated by the district attorney. The officer also falsely told the defendant that his fingerprints were found at the scene, and thereafter the defendant admitted that he had taken the property. The officer then advised the defendant of his *Miranda* rights and took a taped confession, but released him pending the district attorney's decision to bring formal charges.

The Supreme Court made clear that the officer's false statement about fingerprints had nothing to do with whether the defendant was in "custody" for purposes of the *Miranda* rule and held that the defendant was not in custody or otherwise deprived of his freedom of action in any significant way:

"Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes

place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Oregon v. Mathiason, supra,* 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719.

Similarly, in *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), the defendant voluntarily agreed to accompany the police to the station for questioning and was told that he was not under arrest. At the police station the defendant was not advised of his *Miranda* rights, and, during a conversation with the police, he made a statement about a murder. The Supreme Court held that, when the defendant made the statement, he was not in custody or otherwise deprived of his freedom of action in any significant way and therefore *Miranda* warnings were not required.

■ In this case, the police asked Newnam to come to the police station, and he complied. When Newnam arrived at the police station on September 25 he was informed that he was not under arrest and that he was free to leave at any time. There is no indication that the questioning took place while Newnam's freedom to depart was restricted in any way. Under these circumstances we conclude that Newnam's pre-*Miranda* statements on September 25 were not made while he was in "custody or otherwise deprived of his freedom of action in any significant way".[2]

B

We turn to Newnam's argument that the evidentiary use of the statements he made on September 25 violated his due process rights as well as his rights under N.D.C.C. § 29–21–12.1:

"*Statements, admissions or confessions procured by duress, fraud, threat or promises inadmissible in any criminal action.*—Any statement, admission, or confession procured from any person charged with crime in a state court, which was obtained by duress, fraud, threat, or promises, shall not be admissible in evidence against said person in any criminal action."

Newnam contends that his statement was involuntary and coerced because police conduct during the long investigation overcame his will to resist. Newnam asserts that officers repeatedly contacted him despite his attempts to avoid those meetings, that they unjustifiably threatened him with revocation of probation, that they denied him counsel in February 1985 despite advising him of his right to have one appointed, and that they repeatedly made promises and representations about sentencing and other matters over which they had no control. Newnam concedes that some of his statements were made after he signed a waiver of his *Miranda* rights, but, he contends that, under the totality of the circumstances, those statements were obtained by coercion, duress, police misconduct, and violation of his due process rights.

The State responds that the police conduct was not improper and that disputed facts regarding that conduct were resolved in its favor by the trial court. The State asserts that the evidence established that law enforcement officers did not make promises regarding sentencing or threats of revocation of probation.

■ When a defendant attacks the voluntariness of a confession on due process grounds, the outcome depends on the totality of the circumstances. *State v. Discoe,* 334 N.W.2d 466 (N.D.1983); *State v. Carlson,* 318 N.W.2d 308 (N.D.1982), *cert. denied* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 609 (1982). The same approach determines whether a defendant voluntar-

---

**2.** Because Newnam was not in custody, we need not decide whether the police officers' conduct constituted "interrogation" within the meaning of *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), which defined in- terrogation as either express questioning or its functional equivalent. *See also Arizona v. Mauro,* —— U.S. ——, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

ily, knowingly, and intelligently waived his rights. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Carlson, supra*. The prosecution must show waiver by at least a preponderance of the evidence. *Colorado v. Connelly*, ― U.S. ―, ―, 107 S.Ct. 515, 523, 93 L.Ed.2d 473, 485 (1986). A confession may be involuntary and inadmissible even if police have complied with the *Miranda* requirements. *Miranda v. Arizona, supra*.

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973), a case about voluntary consent to a search, the United States Supreme Court described the circumstances to weigh to determine voluntariness of a confession:

> " 'The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will have been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process....'
>
> "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, ... his lack of education ... or his low intelligence, ... the lack of any advice to the accused of his constitutional rights, ... the length of detention, ... the repeated and prolonged nature of the questioning, ... and the use of physical punishment such as the deprivation of food or sleep, ... In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted....

> "The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances.... In none of them did the Court rule that the Due Process Clause required the prosecution to prove as part of its initial burden that the defendant knew he had a right to refuse to answer the questions that were put. While the state of the accused's mind, and the failure of the police to advise the accused of his rights, were certainly factors to be evaluated in assessing the 'voluntariness' of an accused's responses, they were not in and of themselves determinative." [Citations omitted.]

In *State v. Discoe, supra*, 334 N.W.2d at 468, we explained our standard of review in assessing the voluntariness of a confession where there are disputed facts:

> "[W]e show great deference on appeal to the trial court's determination of voluntariness by refusing to reverse its decision unless it is contrary to the manifest weight of the evidence.... The trial court's disposition of a motion to suppress will not be reversed if, after conflicts in the testimony are resolved in favor of affirmance ... there is sufficient competent evidence fairly capable of supporting the trial court's determination." [Citations omitted.]

The trial court found these facts: During the summer of 1985 the investigation did not focus solely on Newnam. Newnam was 25 years old with an average educational background and intelligence. Newnam had significant prior experience in the criminal justice system and had waived his *Miranda* rights no fewer than ten times before September 25, 1985. During the investigation Newnam selectively exercised certain rights such as declining to see a psychologist and declining to give consent to a search. Newnam's appearance at the police station on September 25 was voluntary and not under threat of revocation of probation. Newnam's statement, after he was advised of his *Miranda* rights, was free-flowing, not coached, and divulged information not previously known

to law enforcement officials. Newnam's statements were not the result of any improper coercion or pressure or unequal confrontation. There was no persuasive evidence that law enforcement officials made any inducements or promises of leniency or a deal. The trial court determined that Newnam's statements were freely and voluntarily given as a result of an informed and knowing waiver of his rights.

■ After examining the record for these findings, we conclude that, under the totality of the circumstances, Newnam's September 25 statements were voluntary. The trial court's decision is supported by sufficient competent evidence and is not contrary to the manifest weight of the evidence after resolving evidentiary conflicts in favor of the trial court's findings. Accordingly, we hold the trial court correctly refused to suppress Newnam's September 25 statement and correctly allowed it as evidence in the trial.

### C

Next, our analysis assesses the September 26, 27, and 30 statements. Newnam contends that those statements were not only tainted by the circumstances culminating with the September 25 statement, but were also independently tainted because of unnecessary delay in bringing him before a magistrate.[3] Newnam also points out that he was booked on a false charge which may violate N.D.C.C. § 12.1-11-05. He contends that, considering the totality of the circumstances, his September 26, 27, and 30 statements were coerced.

3. N.D.C.C. § 29-06-25, provides:
  "*Procedure against person arrested without warrant.* When an arrest is made by a peace officer or a private person without a warrant, the person arrested without unnecessary delay must be taken:
  "1. Before the nearest or most accessible magistrate in the county where the arrest is made; or
  "2. If there is no magistrate in said county qualified to act, then before the nearest or most accessible magistrate authorized to act for the county where the arrest is made.
  "A complaint stating the charge against the person arrested must be made before such magistrate, as is provided in rule 5 of the North Dakota Rules of Criminal Procedure."

In two pre-*Miranda* cases, *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), and *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), the United States Supreme Court ruled that statements made after unreasonable delay and before arraignment were excluded from evidence for that reason alone. However, the *McNabb-Mallory* ruling was not based on the Constitution, but was premised on a federal statute for federal prosecutions, not binding in state courts. *State v. Nagel,* 75 N.D. 495, 28 N.W.2d 665, 679 (1947); *State v. Wiberg,* 296 N.W.2d 388 (Minn.1980); 1 Wright, Federal Practice and Procedure: Criminal 2nd § 72 (1982); Annot., 28 A.L.R.4th 1121 (1984). Most states have rejected mechanical application of the *McNabb-Mallory* rule. Instead, delay in arraignment is regarded as a factor to be considered under the totality of the circumstances in determining whether a statement was involuntary and therefore inadmissible under the due process clause. *State v. Wyman,* 97 Idaho 486, 547 P.2d 531 (1976), *overruled on other grounds, State v. McCurdy,* 100 Idaho 683, 603 P.2d 1017 (1979); *State v. Wiberg, supra;* See Annot., 28 A.L.R.4th 1121 (1984).

■ We conclude that the latter approach is consistent with our view expressed in *State v. Nagel, supra,* 75 N.D. at 520, 28 N.W.2d at 679, that "mere delay in taking a defendant before a committing magistrate as required by statute, will not render a confession made in the meantime inadmissible." We condemn this delay in bringing Newnam before a magistrate,[4]

N.D.R.Crim.P. 5(a) provides, in part:
  "An officer or other person making an arrest shall take the arrested person without unnecessary delay before the nearest available magistrate...."

4. In *State v. Barlow,* 193 N.W.2d 455 (N.D.1971), we said that a three-day delay in bringing an accused before a magistrate was a questionable practice and that in some cases a three-day delay would be unreasonable. In *State v. Wyman, supra,* the court noted that a delay in arraignment could result in an unconstitutional restraint on liberty because the defendant is incarcerated without a determination that probable cause existed for an arrest.

but we do not consider the delay determinative in this case. We hold that the delay, by itself, did not make his statements inadmissible. Rather, the delay is one factor in the totality of the circumstances which must be considered. Here, the trial court did consider the delay, the reasons for it, and the fact that the statements made during the delay were only "additional" to "clarify" the main confession made shortly after his arrest.

The trial court determined:

"16. On September 26, 27 and Monday, September 30th at 10:15 a.m. Newnam gave additional voluntary statements which served to clarify the previous statement and to further implicate another.

"17. Friday, September 26 the state's attorney was engaged in preparing the prosecution papers and arranging for the Bismarck prisoner to be returned to Minot so that both might have their initial appearances on Monday afternoon, September 30th.

\*　　\*　　\*　　\*　　\*　　\*

"20. I am satisfied Newnam made the above statements:

"—voluntarily

"—knowingly

"—freely without promises

"—freely without coercion

"—purposely waiving his right to a lawyer.

\*　　\*　　\*　　\*　　\*　　\*

"I conclude that his statements were:

"—Not the result of any unlawful search and seizure

"—Not the result of any confusion of charges or offenses

"—Not the result of any improper coercion or pressure

"—Not the result of any violation of constitutional rights

"—Not the result of any inducements or promises of leniency

"—Not the result of untoward or unequal confrontation."

After a careful review of the record for these findings, we conclude that the September 26, 27, and 30 statements were voluntary. The trial court's determination is supported by sufficient competent evidence and is not contrary to the manifest weight of the evidence after resolving evidentiary conflicts in favor of the trial court's findings. Accordingly, we hold that the trial court correctly refused to suppress those statements and correctly allowed them as evidence in the trial.

## III

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ.