STATE of North Dakota, Plaintiff
and Appellee,

v.

Keith EVERSON, Defendant
and Appellant.

Cr. Nos. 900342, 900343.

Supreme Court of North Dakota.

Aug. 16, 1991.

James A. Hope, Asst. State's Atty., Dickinson, for plaintiff and appellee.

Ralph A. Vinje, of Vinje Law Firm, Bismarck, for defendant and appellant.

VANDE WALLE, Justice.

Keith Everson appealed from two judgments of conviction for class C felony possession of a controlled substance. He asserts on appeal that the trial court erred in refusing to suppress the controlled substances which were discovered by law enforcement officers when he was stopped at a multi-purpose highway checkpoint. We disagree, and accordingly, affirm the judgments of conviction.

During the summer of 1989, Larry Buck, a detective with the Stark County Sheriff's Office, Sgt. Don Glarum of the State Highway Patrol, and Stark County Deputy Sheriff Mike Adolph, were assigned by their supervisors to establish a highway checkpoint in Stark County to coincide with the upcoming annual motorcycle rally in Sturgis, South Dakota. On June 26, 1989, District Eight Highway Patrol Captain David Messer issued Operation Order 2–89 which stated in part:

"Due to the rally in Sturgis, South Dakota and the large volume of drugs on our highways, the North Dakota Highway Patrol along with the Stark County Sheriff's Office and other agencies will conduct a drivers license and registration check. If probable cause presents its self [sic], for drugs and other contraband, a search will be conducted. The check will be conducted on Highway 85 on 5–6 and 13–14 August 1989.

\*    \*    \*    \*    \*    \*

"It will be the mission of the North Dakota Highway Patrol to attempt to alleviate the problem of drugs being transported by vehicle, on state highway's [sic] in North Dakota."

On July 17, 1989, Stark County Sheriff James Rice issued a memorandum in preparation for the operation which stated:

"[C]heck points [sic] will be set up and operated as listed below:

"1.  All vehicles heading in an assigned direction will be stopped.

"2.  Vehicle registration will be checked for current status.

"3.  Driver of vehicle will be checked for current operator's drivers license.

"4.  A vehicle inspection will be conducted.

"Checkpoints will be located on #85, #22, #8 and #10 during assigned times."

On August 5–6 and 13–14, 1989, law enforcement officers conducted a checkpoint 12 miles south of Belfield on U.S. Highway 85. Personnel from the Stark, Billings, and Slope County Sheriff's Offices, the State Highway Patrol, the State Drug Enforcement Unit, the United States Border Patrol, and the Minot Police Department participated in the operation. On August 5 and 6, which coincided with the beginning of the motorcycle rally, all southbound traffic was stopped. On August 13 and 14, which coincided with the conclusion of the rally, all northbound traffic was stopped. The checkpoint was located in a small valley so oncoming traffic could not see it from a long distance. A driver would first see a large sign that said "Please stop." The actual checkpoint was located approximately two-tenths of one mile from the sign. The checkpoint was conducted only during daylight hours.

Every vehicle was stopped at the checkpoint. The driver would first encounter three fluorescent orange traffic cones and an officer referred to as the "point man" who was located at an intersection of the highway and a gravel road. Parked on the gravel road to the driver's right were sheriff's cars, a camper used as a command post, and Drug Enforcement Unit vehicles. Drug Enforcement Unit officers and sheriff's deputies conducted searches of vehicles referred to this area if the driver consented to a search. Two Highway Patrol officers were stationed further down

the highway to conduct vehicle-safety inspections.

The point man made the initial determination whether a vehicle would be sent to the search area or the inspection area, but any officer had the authority to send a vehicle to the search area. The point man would tell drivers that a vehicle safety check was being conducted and that they should have their drivers' licenses and vehicle registrations ready for inspection. The point man could send a vehicle to the search area based on the observation of any illegal activity. Before the law enforcement officers went on duty, they were also given a drug courier profile containing a list of "indicators" of narcotics traffickers. These "indicators" included the following:

"Vehicle Appearance:

"a. low riding, or low rear end

"b. obvious alterations to body

"c. alterations to suspension-new adjustable air shocks

"Interior of vehicle

"a. little or no luggage and long way from alleged home

"b. luggage or spare tire on back seat

"c. coolers/water jugs, fast food wrappers, coffee, bedding

"d. 'Bounce', or similar laundry fresheners

"e. multiple air freshening devices, sprays

"f. 'Glad' type storage bags or aluminum foil or masking tape

"Occupants:

"a. overly courteous, especially if receiving a citation

"b. in a hurry to leave

"c. overly cautious drivers

"d. signs of overt nervousness

"e. won't make eye contact

"f. don't 'know' each other

"g. after questioning the driver outside of the car and away from other occupants, check the story of the other occupants as to destinations, purposes of trip, length of stay, where stayed, etc., and check for discrepencies [sic].

"h. unkempt physical appearance, such as 3–day beard growth, matted hair, fatigued, or 'wired' from stimulants to stay awake."

If a driver or other occupant caused the point man to become suspicious, the driver was sent to the search area where the driver was asked to consent to a search of the vehicle. Otherwise, the driver was sent to the vehicle safety inspection area. If a driver refused to consent to a search, the officers were instructed to allow the driver to proceed without a search.

On August 13, 1989, Everson, traveling from Sturgis to Williston, was stopped at the checkpoint. Everson was driving a 1981 Mazda GLC and pulling a trailer which contained a Harley Davidson motorcycle. The license plate on Everson's trailer was partially broken off. The point man informed Everson that the officers were conducting vehicle safety inspections and that he should get out his driver's license and vehicle registration. The point man then directed Everson toward the vehicle safety inspection area. Sgt. Glarum of the Highway Patrol, who was conducting safety inspections at the time, checked Everson's driver's license and vehicle registration and conducted a safety check. Sgt. Glarum then had Everson pull his vehicle over to the side of the road. Apparently, other drivers who were given vehicle safety inspections were not required to pull over to the side of the road. Sgt. Glarum explained:

"Q [By Mr. Hope] . . . Why was it you had him pull over to the side of the road?

"A Because I was running a license check for the plate on the trailer and only had half a plate there, but I had the tab, and we were running that, and it was taking some time to get our results back from—from our check on that plate.

"Q So you had him pull over to the side of road to let other traffic through?

"A Right. Because other traffic was starting to back up, and they were down because there were others—was another

highway trooper that there—that was inspecting.

\* \* \* \* \* \*

"A When we were waiting for the check to come back on the plate, we were visiting. I was standing outside the car, right beside his driver's door. He was sitting behind the wheel, and we were talking. There was damage on the motorcycle—the plate—and Mr. Everson seemed to be quite confused and nervous, and at that point I asked him if he was carrying any contraband such as drugs and weapons, and he said, no. I asked him, can I search—could we search your vehicle, and he says all I have is some open liquor in the trunk. I says, Well, if it's in the trunk, there's no violation there, you know. We aren't going to do anything. What we would like to do is search your vehicle for narcotics or weapons, and at that point he said, 'Yes.' At which—then I called the drug team, which was Chuck and Judy. They came up with the paper for the consent to search. He signed it, and we searched the vehicle.

"Q At any time did he tell you, in response to your request for a search, did he tell you I'd rather not have you search my car?

"A No, sir."

The search of Everson's vehicle resulted in the discovery of methamphetamine and hashish. Everson was arrested and ultimately charged with possession of controlled substances. Everson pled not guilty to the charges and moved to suppress the evidence on the ground that it was obtained in violation of the Fourth Amendment to the United States Constitution. Following an evidentiary hearing, the trial court agreed with Everson that the checkpoint was unconstitutional, in part because it was pretextual:

"Although the State characterizes this roadblock as multi-purpose, the main purpose was to search for controlled substances. This is reflected by the lead person being a criminal investigator not a traffic officer, by the operation order for the Highway Patrol stating that the purpose was 'to alleviate the problem of drugs being transported by the [sic] vehicle,' by the point man having unconstrained discretion to send vehicles to the search area or the inspection area, and by the first and main area at the roadblock being the search area."

However, the trial court refused to suppress the evidence, concluding that Everson gave a valid, uncoerced consent to the search which purged any taint of illegality stemming from the initial stop:

"Although Everson was stopped at the roadblock, he was not in custody at the time of Sgt. Glarum's request. Everson was in the area of the vehicle inspections with only Sgt. Glarum. Without any threats or show of force, Sgt. Glarum asked Everson if he would consent to a search. Only after Everson verbally consented did Sgt. Glarum request the drug enforcement unit to take over. Before they conducted the search, they asked Everson to sign a consent form for the search, which he then signed. Everson appears to be of normal intelligence and to have understood what was happening. And an uncoerced consent to search purges any illegality of the original stop. *U.S. v. Varona–Algos*, 819 F.2d 81, 83 (5th Cir.1987)."

Everson entered a conditional plea of guilty to the two possession charges, reserving his right to challenge the trial court's denial of his suppression motion. See Rule 11(a)(2), N.D.R.Crim.P. Judgments of conviction were entered and Everson has appealed. We affirm the convictions, but for reasons which differ from those relied upon by the trial court.

## LEGALITY OF CHECKPOINT

■ Temporary checkpoint stops of vehicles are "seizures" under the Fourth Amendment. *Michigan Department of State Police v. Sitz*, —— U.S. ——, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990); *United States v. Martinez–Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976). Accordingly, we must determine whether the checkpoint in this case was "reasonable" under Fourth

Amendment standards. *State v. Wetzel,* 456 N.W.2d 115, 118 (N.D.1990).

In *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the United States Supreme Court disapproved the use of random stops to apprehend unlicensed drivers and unsafe vehicles. Noting that the purpose of the Fourth Amendment was to impose a standard of " 'reasonableness' upon the exercise of discretion by government officials," the Court employed a two-pronged balancing test to weigh the competing interests of the government in highway safety against an individual's reasonable expectation of privacy in his or her automobile in determining whether the random, roving spot checks by the patrolman in that case were constitutional. *Prouse, supra,* 440 U.S. at 653–654, 99 S.Ct. at 1396. The Court held that "except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." *Prouse, supra,* 440 U.S. at 663, 99 S.Ct. at 1401. The Court added, however, that states were not precluded from developing systematic methods "for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." *Prouse, supra.* The *Prouse* dictum did not fall into obscurity. See cases collected in Annotation, *Validity of Routine Roadblocks by State or Local Police for Purpose of Discovery of Vehicular or Driving Violations,* 37 A.L.R.4th 10 (1985).

We have applied the *Prouse* rationale to vehicle safety inspections on two occasions. In *State v. Goehring,* 374 N.W.2d 882 (N.D.1985), the defendant's vehicle was stopped by a patrolman for a routine safety check of the vehicle. The patrolman discovered that the defendant's driver's license had been suspended. We noted several factors to be considered when applying the *Prouse* balancing test, including: the importance of the governmental interest at stake, the amount of physical and psychological intrusion upon the individual's Fourth Amendment interests, the subjectiveness of the intrusion, the availability of practical alternatives, and the efficiency of the procedure used. *Goehring, supra,* 374 N.W.2d at 887. We reversed the trial court's denial of the defendant's suppression motion because the record did not show the guidelines or procedures the patrolman was operating under in conducting the safety checks: "We have no way of knowing whether these procedures allow officers no discretion, some discretion, or total discretion in deciding which vehicles are flagged over and checked." *Goehring, supra,* 374 N.W.2d at 888.

In *Wetzel, supra,* we upheld the constitutional validity of a vehicle safety inspection checkpoint. The procedure used by the Highway Patrol officer who conducted the checkpoint was "to stop a car, conduct an inspection, and then 'stop the next available vehicle when safe' " in accordance with Policy 3–7 of the North Dakota Highway Patrol Policy Manual. *Wetzel, supra,* 456 N.W.2d at 116. We recognized the state's "vital interest in ensuring that the vehicles on its roads are safe for operation, and that licensing requirements are being observed." *Wetzel, supra,* 456 N.W.2d at 120. We found that the state's interest outweighed the intrusiveness of the checkpoint into the defendant's privacy rights under the circumstances. We noted that "what disturbed the Court in *Prouse* was the patrolman's unconstrained discretion in randomly stopping any car, at any time, and under any procedure he desired," and concluded the procedure used by the officer "was sufficiently systematic to pass constitutional muster." *Wetzel, supra,* 456 N.W.2d at 118, 120. The stop of the defendant's vehicle "wasn't merely an act of unbridled whim, but was a part of a calculated pattern established for inspecting vehicles at a fixed checkpoint." *Wetzel, supra,* 456 N.W.2d at 121.

One month after we rendered our decision in *Wetzel,* the United States Supreme

Court issued its decision in *Sitz, supra*, in which the Court considered the constitutionality of an investigatory roadblock, a "sobriety checkpoint," operated by Michigan's state police. The checkpoint was operated under guidelines governing checkpoint publicity, site selection, and police procedure at the checkpoint itself which were created by an advisory committee composed of law enforcement officials and transportation researchers from the University of Michigan.

Under the guidelines, all drivers passing through the checkpoint would be stopped and briefly examined for signs of intoxication. Only if the checkpoint officer detected signs of intoxication would a driver be directed out of the traffic flow for a driver's license and registration check and, if warranted, further sobriety tests. Otherwise, the drivers would be allowed to proceed. During the checkpoint, which was maintained for one hour and fifteen minutes, 126 vehicles were stopped for an average of 25 seconds each. The checkpoint yielded two arrests for driving under the influence, approximately 1.5 percent of the stopped drivers. *Sitz, supra*, 110 S.Ct. at 2484.

In analyzing the constitutionality of the checkpoint, the Supreme Court used the balancing test developed in *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979), which "involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." [1]

The Supreme Court recognized "the magnitude of the drunken driving problem [and] the States' interest in eradicating it," and, when viewed in light of the effectiveness of sobriety checkpoints in achieving that goal, concluded that the states' interest outweighs the "slight" intrusion on

drivers stopped briefly at sobriety checkpoints. *Sitz, supra*, 110 S.Ct. at 2485, 2486. In rejecting the lower court's determination that the "subjective intrusion" caused by the checkpoints was unreasonable, the Court reasoned that the intrusion was to be measured objectively by the duration of the stop and the nature of the investigation, which it found, for constitutional purposes, indistinguishable from the checkpoint stops for illegal aliens it upheld in *Martinez–Fuerte*. *Sitz, supra*, 110 S.Ct. at 2487. The Court determined that the drunk-driver arrest rate adequately demonstrated that the checkpoint advanced the state interest and that the lower court, which had concluded based on extensive testimony that the checkpoint failed the "effectiveness" part of the test, had erroneously applied that prong. The Court held that this factor "was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Sitz, supra*, 110 S.Ct. at 2487. Balancing the three factors, the Court concluded that the state program was "consistent with the Fourth Amendment." *Sitz, supra*, 110 S.Ct. at 2488.

■ In analyzing the constitutionality of the checkpoint in this case, we begin by noting the trial court's apparent determination that the checkpoint was unconstitutional because it was conducted as a pretext or subterfuge to check for the presence of controlled substances. The State does not challenge the trial court's finding that the primary purpose of the checkpoint was to look for controlled substances, but asserts that this fact should not in itself invalidate the checkpoint. We agree.

■ The *Sitz* Court, in upholding the constitutionality of an investigatory checkpoint designed to apprehend drunk drivers,

1. The *Brown* test differs somewhat from the two-pronged *Prouse* test that has traditionally been applied to checkpoints. The *Brown* test divides the *Prouse* "promotion of legitimate governmental interests" prong into two parts. See *State v. Patterson*, 582 A.2d 1204, 1205 (Me. 1990), *cert. denied*, — U.S. —, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *Chock v. Commissioner of Public Safety*, 458 N.W.2d 692, 693 (Minn.Ct. App.1990). *Brown* "looks at the 'gravity' of the public interest as a measure of its legitimacy and at the extent the seizure 'advances' the interest as a measure of its promotion." *Patterson, supra*.

recognized the magnitude of, and the states' important interest in eradicating, that problem. Everson concedes, and we agree, that attempting to "alleviate the problem of drugs being transported by vehicles on state highways in North Dakota" also encompasses an important state interest. The Supreme Court has specifically recognized "the veritable national crisis in law enforcement caused by smuggling of illicit narcotics" [*United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985) ], and has characterized drug trafficking as "one of the greatest problems affecting the health and welfare of our population." *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 668, 109 S.Ct. 1384, 1392, 103 L.Ed.2d 685 (1989). If a state may validly conduct a checkpoint for the purpose of apprehending drunk drivers, we think the state may validly conduct a checkpoint for the purpose of apprehending drug traffickers, a societal harm at least equal in magnitude to drunk driving. On this point we concur with the reasoning of the Illinois Supreme Court in *People v. Bartley*, 109 Ill.2d 273, 93 Ill.Dec. 347, 486 N.E.2d 880, 888–889 (1985), *cert. denied*, 475 U.S. 1068, 106 S.Ct. 1384, 89 L.Ed.2d 608 (1986):

> "[T]he circuit judge found, as a matter of fact, that the true purpose of this roadblock was to apprehend DUI violators and that the drivers' license check was a subterfuge. The State, in argument before this court, did not quarrel with this finding. The official subterfuge with respect to the true purpose of the roadblock is not entitled to significant weight in the balancing process. The subjective reaction of drivers stopped at the roadblock would not have been substantially different had the participating officers been instructed that the primary purpose of the stop was to check on drunken drivers rather than on license violations. In this case the officers' observations of evidence of intoxication entailed slight, if any, additional intrusion on defendant."

Contrary to the trial court's ruling, this checkpoint is not rendered unconstitutional merely because its true purpose was to apprehend narcotics traffickers. Contra

*Galberth v. United States*, 590 A.2d 990 (D.C.Ct.App.1991) [suspicionless stop at roadblock established for primary purpose of combating illegal drug activity violates Fourth Amendment].

■ As we have noted, the State has a vital interest in eradicating the problem of narcotics trafficking. We have also recognized that the State has a vital interest in ensuring that the vehicles on its roads are safe for operation, and that licensing requirements are being observed. *Wetzel, supra*, 456 N.W.2d at 120; *Prouse, supra*. These state interests must be balanced with the degree to which this checkpoint advances the public interests, and the severity of the interference with individual liberty caused by the checkpoint.

The Highway 85 checkpoint was planned more than one month before it occurred and was organized by state and local law enforcement officers. The officers in charge of establishing the checkpoint were assigned that duty by their supervisors. Sheriff Rice chose the days the checkpoint would be in operation and the location was chosen because of the officers' belief "that Highway 85 would be a very busy traffic area during that time period due to the Sturgis rallies and it being [the] main route into North Dakota into the western part of the state." Written directives were issued requiring that all vehicles traveling in an assigned direction be stopped and outlining the officers' duties at the checkpoint. The vehicle safety inspections were conducted pursuant to written procedures found in Policy 3–7 of the North Dakota Highway Patrol Policy Manual. See *Wetzel, supra*, 456 N.W.2d at 116 n. 1. Supervisors monitored the checkpoint on occasion. Contrary to the assertion by Everson, this was not a checkpoint that was operated in a haphazard manner or organized without sufficient supervisory control.

The officers had no discretion over which vehicles to stop. All vehicles were stopped. Although the point man did not direct Everson to the search area in this case, Everson asserts, and the trial court apparently agreed, that the checkpoint was constitutionally defective because the point man

had "unconstrained discretion to send vehicles to the search area or the inspection area." In *Martinez–Fuerte, supra,* 428 U.S. at 562–563, 96 S.Ct. at 3085, the Supreme Court said in the context of checkpoint stops for illegal aliens that it is constitutional for a point agent to refer motorists selectively to secondary inspection areas for further questioning "on the basis of criteria that would not sustain a roving-patrol stop." Moreover, even though the Court in *Sitz, supra,* 110 S.Ct. at 2485, indicated that detention of particular motorists beyond the initial stop for more extensive questioning or testing "may require satisfaction of an individualized suspicion standard," we do not view the point man's decision to send a vehicle to either the search area or the inspection area as being unconstrained by any reasonable standards or guidelines. When asked the basis for sending vehicles to the search area, Detective Buck testified:

"A Could have been probable cause, the officer could have seen an open container. Could have been that the officer smelled odor of alcohol on a person. Could have seen a controlled substance in a vehicle. There may have been a lot [of] different indicators about the person and/or the vehicle that could tell the officer that something isn't right here. A person may have controlled substances, stolen property, a lot of factors involved."

Detective Buck further testified that, prior to going on duty, law enforcement officers were briefed on what to look for at the checkpoint. Also, each officer was given a copy of a drug courier profile.[2] The officers in this case were instructed to refer vehicles to the search area upon observation of possible illegal activity. Of the 1,023 vehicles that were stopped at the roadblock, only 34 searches were conducted. Based on this record, we are unable to conclude that the point man had unconstrained discretion to refer vehicles to the search area.

We view the intrusion on individual liberties occasioned by the checkpoint to be minimal. Although the checkpoint was set up in a small valley so it could not be seen from a long distance, the operation was conducted during daylight hours and law enforcement vehicles could be observed when a driver approached it. Most officers were in uniform and drivers could see that all vehicles were being stopped. It is apparent that a driver's contact with the point man was brief and that the vehicle safety inspections lasted "between three and ten minutes depending on the violations detected on the vehicle." Drivers were not questioned unless suspicions were aroused. Searches were conducted only with the consent of the drivers.

Everson challenges the effectiveness of the checkpoint. The record reflects that 1,023 vehicles passed through the checkpoint during the four days it was conducted. Officers detected 135 equipment violations, two driver's license violations, and one studded tire violation. Several truck-enforcement permits were also issued. Criminal charges resulting from the checkpoint included one for carrying a loaded firearm, one for being an escaped prisoner, and two for minor in possession of alcohol. Only two controlled substance arrests were

---

**2.** There is nothing inherently sinister or improper about a drug courier profile. Trained law enforcement officers may observe and be able to perceive and articulate meaning to presumably innocent conduct which may pass without notice by an untrained observer. See *Brown, supra,* p. 700, 443 U.S. at 52 n. 2, 99 S.Ct. at 2641 n. 2; *State v. Mische,* 448 N.W.2d 415, 419 (N.D.1989) [recognizing that "police officers may have expertise that exceeds that of laypersons"]. "Among the circumstances that can give rise to reasonable suspicion are the agent's knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices." *United States*

*v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980) (Powell, J., concurring). The use of a drug courier profile "is simply a means by which the law enforcement team communicates its collective expertise and empirical experience to the officer in the field and by which the officer, in turn, explains the special significance of his observations to the court." *Derricott v. State,* 84 Md.App. 192, 578 A.2d 791, 796 (1990). "It is but one of the ways in which an officer accumulates articulable suspicion." *Derricott, supra;* see, e.g., *United States v. Sokolow,* 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989).

made, amounting to .196 percent of the vehicles stopped. In rejecting the argument that an arrest rate of only 1.5 percent showed that the sobriety checkpoint was ineffective in combating the drunk driving problem, the Court in *Sitz, supra,* 110 S.Ct. at 2488, responded:

"By way of comparison, the record from one of the consolidated cases in *Martinez–Fuerte,* showed that in the associated checkpoint, illegal aliens were found in only 0.12 percent of the vehicles passing through the checkpoint. See 428 U.S., at 554, 96 S.Ct., at 3081. The ratio of illegal aliens detected to vehicles stopped (considering that on occasion two or more illegal aliens were found in a single vehicle) was approximately 0.5 percent. See *Ibid.* We concluded that this 'record ... provides a rather complete picture of the effectiveness of the San Clemente checkpoint', *ibid.,* and we sustained its constitutionality. We see no justification for a different conclusion here."

Likewise, we cannot say that the rather low percentage of arrests for possession of controlled substances resulting from this checkpoint shows that the checkpoint is ineffective for constitutional purposes.[3]

Balancing the State's interest, the extent to which the checkpoint reasonably advances that interest, and the relatively minimal degree of intrusion upon individual liberties caused by the checkpoint, we conclude that the Highway 85 checkpoint did not violate the Fourth Amendment.

### CONSENT TO SEARCH

At this point it is appropriate to restate some of the relevant facts. After Everson was initially stopped at the checkpoint, the point man directed Everson to proceed to the vehicle inspection area, where Sgt. Glarum was located, rather than to the search area which was occupied by drug enforcement unit officers. The license plate on

Everson's trailer was partially broken off. The trial court recited in its findings the following sequence of events:

"Sgt. Glarum conducted the safety inspection on Everson's vehicle. Due to a delay in checking Everson's trailer license, S[g]t. Glarum asked Everson to pull over to the side of the road to allow the other traffic through. At that time, Everson appeared confused and nervous. Then, Sgt. Glarum asked Everson if he would consent to a search of his vehicle.

"After Everson verbally consented to the search, Sgt. Glarum asked the drug unit to take over. Then, Chuck Turner, with the North Dakota Drug Enforcement Unit, asked Everson to sign a permission to search, and Everson signed it...."

The trial court, having determined that the initial checkpoint stop itself violated the constitution, did not determine whether the additional detention of Everson after the safety check of the vehicle was completed was reasonable under the Fourth Amendment. See *Sitz, supra,* 110 S.Ct. at 2485. However, we have no difficulty in concluding that the additional detention, caused by the delay in obtaining a license check on the trailer because of the plate's mutilated condition, was justified under the circumstances. See also, §§ 39–04–11, 39–04–13, 39–04–40, N.D.C.C. Also, Sgt. Glarum was not required to have a reasonable suspicion that Everson was engaged in drug trafficking in order to request consent to search his vehicle for drugs. *See generally Florida v. Bostick,* — U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Because we have concluded that the initial checkpoint stop and the additional detention of Everson were valid under the Fourth Amendment, we need not address the trial court's determination that a voluntary, uncoerced consent to search purges any illegality of the original stop.[4]

---

3. In any event, the effectiveness of the checkpoint is but one factor to be weighed under the *Brown* balancing test. See *Sitz, supra,* 110 S.Ct. at 2488. It is the outcome of a balance of the *Brown* factors that determines the constitutionality of a particular checkpoint procedure. See

*State v. Hester,* 245 N.J.Super. 75, 584 A.2d 256, 258–259 (App.Div.1990).

4. We note, however, that there is contra authority to this proposition. E.g., *United States v. Delgadillo–Velasquez,* 856 F.2d 1292, 1299 (9th

The sole issue remaining is whether Everson's consent to search was voluntary under the circumstances.

■ "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given...." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). In determining voluntariness, the trial court must examine the totality of the circumstances surrounding the giving of a consent to search to see whether it was the product of an essentially free choice or the product of coercion. *State v. Discoe*, 334 N.W.2d 466, 467 (N.D.1983). In *Discoe, supra*, 334 N.W.2d at 468, we explained our standard of review in assessing the voluntariness of a consent to search where there are disputed facts:

> "[W]e show great deference on appeal to the trial court's determination of voluntariness by refusing to reverse its decision unless it is contrary to the manifest weight of the evidence.... The trial court's disposition of a motion to suppress will not be reversed if, after conflicts in the testimony are resolved in favor of affirmance ... there is sufficient competent evidence fairly capable of supporting the trial court's determination."

See also, *State v. Pickar*, 453 N.W.2d 783, 785 (N.D.1990); *State v. Newnam*, 409 N.W.2d 79, 84 (N.D.1987).

■ Everson was referred not to the search area, where he claims drug enforcement agents were dressed in a "SWAT-like manner," but to the less-coercive vehicle inspection area. Everson was alone with Sgt. Glarum when he verbally consented to the search. Although Everson asserts that he initially refused to consent, the trial court resolved that factual dispute against him. In addition, even though it does not appear from the record that Sgt. Glarum informed Everson that he had a right to refuse consent, knowledge of a right to refuse is not a prerequisite of a voluntary consent to search. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 234, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973). The trial court found that Sgt. Glarum requested Everson's consent "[w]ithout any threat or show of force" and that drug enforcement agents did not ask him to sign a consent form until after he had verbally consented to Sgt. Glarum. There is sufficient competent evidence in the record to support these findings. The trial court also found that Everson is "of normal intelligence" and "understood what was happening." Upon review of the record, we cannot say the trial court's determination that Everson voluntarily consented to the search is against the manifest weight of the evidence.

We conclude that the trial court did not err in denying Everson's motion to suppress. Accordingly, the judgments of conviction are affirmed.

ERICKSTAD, C.J., and GIERKE, J., concur.

LEVINE, Justice, dissenting.

The Fourth Amendment proscribes unreasonable searches and seizures and, traditionally, requires probable cause or reasonable, *i.e.*, individualized, suspicion for a seizure to be judged reasonable. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). This case poses the question whether the police may, under the Fourth Amendment, stop vehicles in a nonrandom fashion without individualized suspicion by use of a temporary roadblock to conduct a safety check on vehicles in order to "attempt to alleviate the problem of drugs being transported by vehicle" in North Dakota, that is, to promote general law enforcement purposes.

In this case, the roadblock was implemented to discover evidence of drugs. Next time, under the rationale of the majority, the roadblock may be designed to discover evidence of stolen property, illegal guns, transportation of underage females

Cir.1988) ["The mere fact that consent to search is voluntary ... does not mean that it is untainted by a prior illegal arrest"]; *United States v. Thompson*, 712 F.2d 1356, 1361–1362 (11th Cir. 1983) [applying same principle to person illegally detained for lack of reasonable suspicion].

for purposes of prostitution, or violations of any other criminal law. While I am uncertain about the parameters of *Michigan Dept. of State Police v. Sitz,* — U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), I am persuaded that they do not extend as far as the majority concludes. I thus believe that the trial court was correct in ruling that the initial stop was illegal. However, because of the illegality of the initial stop, the consent of Everson was invalid because it was tainted by the prior illegal arrest. *See* n. 4 of the majority opinion and the cases cited therein.[1] I would, therefore, reverse the convictions because they were based on illegally obtained evidence.

In *Sitz,* the United States Supreme Court upheld the constitutionality, under the Fourth Amendment, of a sobriety checkpoint. *Sitz* revolved about the slaughter on the highways caused by drunk drivers and the gravity of the State's interest in preventing that continued slaughter. The nonrandom safety inspection of vehicles that is permissible under the progeny of *Delaware v. Prouse,* and the sobriety checkpoint condoned by *Sitz* are closely related. The safety inspection promotes the safety of vehicles on the highway; the sobriety inspection promotes the safety of drivers on the highway. Both promote highway safety. That either results in criminal convictions of violators is incidental to its primary purpose: the promotion of safety on the highways.

In effect, *Sitz* clarified the meaning of safety inspections. If safety inspections of vehicles to promote safety on the highways are constitutionally permissible, when "part of a calculated pattern established for inspecting vehicles at a fixed checkpoint," *State v. Wetzel,* 456 N.W.2d 115, 121 (N.D.1990), then safety inspections of

drivers in those vehicles must be similarly permissible. All *Sitz* did was encompass within the boundary of a permissible safety check, a cursory inspection of the driver. I do not believe that *Sitz* demonstrates an intent to remove from the Fourth Amendment requirement of reasonable suspicion, all temporary roadblocks maintained to search for evidence of crimes. The fact that drunk driving is a crime is really irrelevant to *Sitz.* Safety, not criminal investigation, is what was being condoned.

If we are to extend *Sitz* to condone a nonrandom roadblock whose purpose is to look for illegal drugs, then any nonrandom roadblock whose purpose is to look for evidence of any criminal conduct is permissible under the Fourth Amendment. But the war on drugs cannot suspend constitutional guarantees. *Florida v. Bostick,* — U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). "If that war is to be fought, those who fight it must respect the rights of individuals...." *Id.* 111 S.Ct. at 2389. I assume, until the United States Supreme Court tells me otherwise, that the Fourth Amendment still has some application to vehicles. Drivers' expectations of privacy in those vehicles, so long as those drivers are obeying traffic laws, are not in the vicinity of or crossing a border, and are not drinking or otherwise using illegal substances, still find some protection under the Fourth Amendment and its requirement of reasonable suspicion in order to make a seizure reasonable. At least, I hope so.

The police officers here admitted using the safety inspection in order to achieve their purpose of "alleviating" the drug problem. In *State v. Kunkel,* 455 N.W.2d 208 (N.D.1990), police officers were equally candid. They admitted that their purpose in seizing a van and inventorying its contents was to search for drugs. But an

---

**1.** Although I conclude that Everson's consent is invalid because "tainted," I am alarmed at the ease with which the majority dismisses the significance of the absence of advice by the police to Everson that Everson had a right to refuse consent. It seems to me that if roadblocks are now going to be part of the arsenal of police tactics, the judiciary should apply careful scrutiny when gauging the validity of such an "uninformed" consent. *See Florida v. Bostick,* — U.S. ——, 111 S.Ct. 2382, 2385, 115 L.Ed.2d 389

(1991), where the court, in analyzing the issue of the validity of the consent to search and the facts supporting the validity of that consent, highlighted the circumstance that "the police specifically advised Bostick that he had the right to refuse consent." It does not appear that the factfinder considered the impact of the failure to advise Everson in assessing the voluntariness of Everson's consent. I would remand to give the trial judge the opportunity to do so.

inventory of property in police custody may not be used as a subterfuge for criminal investigation. *Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman,* 428 U.S. 364, 376, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976). Because the inventory search of the van was conducted to discover evidence of crime and not to fulfill the proper caretaking purpose of an inventory search, we held that the evidence was illegally obtained. *State v. Kunkel,* 455 N.W.2d at 211. We should achieve an analogous result here.

I respectfully dissent.

MESCHKE, Justice, concurring.

I would affirm the trial court's findings that the checkpoint was pretextual and unconstitutional. Justice Levine's dissent is persuasive that the Fourth Amendment still has some application to vehicles.

However, I would also affirm the trial court's finding that Everson's uncoerced consent purged the illegality of the original stop. "Evidence of a crime, sufficiently distinguishable from and independent of the taint of official misconduct, is not suppressed." *State v. Ritter,* 472 N.W.2d 444 (N.D.1991). *See also State v. Thordarson,* 440 N.W.2d 510 (N.D.1989). Therefore, I concur in affirming the judgments of conviction.