2014 ND 134

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Ronald William ROGERS Jr., Defendant and Appellant.**

**No. 20130357.**

Supreme Court of North Dakota.

June 24, 2014.

Rehearing Denied July 22, 2014.

Tristan Jones Van de Streek, Assistant State's Attorney, Fargo, ND, for plaintiff and appellee.

Benjamin C. Pulkrabek, Mandan, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] Ronald William Rogers Jr. appealed from a criminal judgment entered by the district court after he conditionally pled guilty to murder and willful disturbance of a dead body. We affirm, concluding Rogers was not in police custody when he confessed to the crimes and that his confession was not involuntary.

I

[¶ 2] At approximately 10:30 p.m. on February 19, 2013, Fargo Police responded to a 911 call reporting an alleged suicide. The caller, Ronald William Rogers Jr., reported his wife committed suicide in their South Fargo home. When officers arrived at the scene they discovered the dead body of Elizabeth Rogers lying on the floor near an upstairs bedroom. The victim appeared to have suffered a single gunshot wound to the head. The victim was also holding a semi-automatic handgun in her right hand.

[¶ 3] Rogers was at home when officers arrived. Rogers gave officers verbal consent to search the home. Shortly thereafter, Rogers appeared to suffer a panic attack, and he was taken to Essentia Hospital in Fargo. Officers later obtained a search warrant and searched the home.

[¶ 4] While at Essentia Hospital, Rogers was questioned by Detective Ysteboe. The interview was recorded. Rogers told the detective that he and Elizabeth had been drinking and had an argument. Rogers stated he went to bed and Elizabeth came into the bedroom with a gun and shot over his head twice. Rogers stated Elizabeth shot herself before he was able to grab her. Rogers indicated Elizabeth held the gun in her right hand, raised the weapon to the right side of her head and fired the weapon. Rogers was not allowed to return to his residence that evening, and instead stayed the night at the Fargo Days Inn.

[¶ 5] On the morning of February 21, staff at the Days Inn contacted the Fargo Police and requested officers to conduct a welfare check on an intoxicated man in the hotel lobby. Officer Ronning responded to the call and made contact with Rogers,

who appeared intoxicated and emotionally distraught. Officer Ronning was not involved in the underlying suicide investigation. Rogers made a comment that Officer Ronning considered a suicidal threat. As a result of the threat, Officer Ronning brought Rogers back to Essentia Hospital. Officer Ronning completed a 72–hour mental health evaluation form so that medical staff could see Rogers. Rogers was then turned over to hospital staff and placed under a medical hold by Essentia.

[¶ 6] Later in the afternoon, Rogers was discharged from Essentia and transferred by ambulance to Prairie St. John's Hospital in Fargo. Carrie Avery, the House Charge Supervisor at Prairie St. John's, testified at the suppression hearing that Rogers was transported by ambulance to Prairie St. John's after doctors at Essentia referred him to Prairie's Needs Assessment Department. Prairie assessed Rogers based on his medical documentation, laboratory results, and other pertinent information. Following the assessment, Prairie conducted a three-way consultation between Prairie's medical doctor, a licensed addiction counselor, and the referring doctor from Essentia. Law enforcement was not involved in any discussion or decision to discharge Rogers from Essentia or admit him to Prairie. Avery testified Prairie does not honor medical holds placed on individuals by law enforcement; the doctor makes the actual decision whether or not the hold continues.

[¶ 7] Elizabeth's autopsy was also conducted on February 21. The autopsy revealed the bullet entrance wound was on the left side of Elizabeth's head and not the right side as Rogers previously indicated. A second search warrant was executed and officers collected additional information from the scene of the shooting. At that point, the suicide investigation turned into a murder investigation.

[¶ 8] At about 9:20 p.m. that evening, Rogers, who was under medical hold at Prairie St. John's, called the Fargo Police Department and attempted to speak with a supervising officer. A supervising officer was unavailable at the time, so Rogers spoke with Lieutenant Renner. Rogers inquired as to the results of his wife's autopsy. Rogers said he wanted to speak with law enforcement.

[¶ 9] Detectives Loos and Ysteboe went to visit Rogers at Prairie at approximately 1:00 a.m. on February 22. When they arrived at the Prairie facility, the detectives were met by Carrie Avery, the House Charge Supervisor. Avery did not immediately grant the detectives access to meet with Rogers. The detectives told Avery that Rogers had requested earlier in the evening to speak with them, and they asked if they could speak with Rogers at that time. Avery instructed the officers to wait in the lobby. Avery contacted Geoffrey Maina, the RN who was working directly with Rogers, to ascertain whether he still wanted to speak with the detectives. Rogers was apparently sleeping at the time. After being woken up, Rogers told Maina he wanted to speak with the detectives.

[¶ 10] Avery instructed the detectives that they could use a report room for the interview. Avery decided where the interview was conducted. At the suppression hearing, Avery described the interview room as a quiet space where detectives and Rogers could have privacy to talk. She also described the room as large and well lit. The room had two entrances, a window on the backside of the wall, and was furnished with tables and chairs.

[¶ 11] The interview was recorded by audio and video equipment. The detectives did not lock or block the doors. The detectives wore street clothes. The detective's badges and guns were on their belts.

Detective Loos' gun and badge were concealed by his sweatshirt. During the interview, Rogers was able to move around the room. Detectives also provided Rogers with a plastic gun to reenact the events that took place. Rogers also used the detectives to act out the shooting. Rogers was not handcuffed, nor was he read a *Miranda* warning. During the interview, Rogers admitted to shooting his wife.

[¶ 12] Based on this confession, Rogers was charged with murder and willful disturbance of a dead body. Rogers filed a motion to suppress his confession. At the hearing on the motion, Detective Ysteboe testified that at the beginning of the interview Rogers seemed a little groggy and sleepy. Ysteboe testified that Rogers said he had just woken up, but that he was feeling good. The detective testified Rogers did not appear intoxicated, did not have trouble walking, and did not have trouble communicating or slur his speech.

[¶ 13] Detective Loos also testified. Detective Loos testified he attended the autopsy and learned that the entry wound was on the victim's left side of the head. The detective testified he interviewed Rogers at Prairie for approximately two and a half hours. The detective stated the interview was conversational. He testified, "When we would ask questions that we knew would be hard for Mr. Rogers to answer, the tone in the room was very quiet. It was a very soft, quiet interview."

[¶ 14] Geoffrey Maina, the RN assigned to work with Rogers at Prairie, also testified. Maina testified it was his job to ensure Rogers was safe during the night. Maina testified he gave Rogers 100 milligrams of Trazadone, a medication for sleep, at approximately 12:11 a.m. on the morning of February 22. Maina stated he observed Rogers go to bed at 12:30 a.m. Maina testified he woke Rogers up after Avery, the House Charge Supervisor,

called him from the front desk and said there were detectives who wanted to speak with Rogers. Maina testified Rogers woke up at approximately 1:30 a.m. Maina testified Rogers wanted to speak with the detectives. Rogers appeared alert, awake, and was communicative. Maina also testified he did not have time to assess Rogers for effects of the Trazadone. Maina testified he left the room during the interview. Maina went back into the room to check on Rogers after approximately an hour. Maina testified that Rogers appeared okay. Later, Maina again entered the interview room and asked Rogers how he was. Rogers again indicated he was okay. Maina testified the interview ended at approximately 4:30 a.m. The detectives did not immediately arrest Rogers following his confession. Maina testified he escorted Rogers to the detectives and handed him off to the police after the doctor signed an order to discharge him. Maina also stated that from the time Rogers entered Prairie until the time he was released into police custody, Rogers could not leave the medical unit.

[¶ 15] Rogers filed a motion to suppress the statements he made to law enforcement while at Prairie St. John's. Rogers argued the statements violated his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and were not voluntary. The district court concluded, based on the totality of the circumstances, Rogers was not in police custody while he was interviewed at Prairie St. John's. The court also concluded the statements were voluntary. The motion to suppress was denied, and Rogers entered a conditional guilty plea.

## II

[¶ 16] Rogers argues his confession was obtained in violation of *Miranda*. The State acknowledges Rogers was not

given a *Miranda* warning, but contends he was not in custody, and therefore no warning was required. Because there was no custodial interrogation, the district court concluded, *Miranda* warnings were not warranted.

■ [¶ 17] This Court has stated:

When reviewing a district court's ruling on a motion to suppress, we defer to the district court's findings of fact and resolve conflicts in testimony in favor of affirmance. We recognize that the district court is in a superior position to assess the credibility of witnesses and weigh the evidence. Generally, a district court's decision to deny a motion to suppress will not be reversed if there is sufficient competent evidence capable of supporting the district court's findings, and if its decision is not contrary to the manifest weight of the evidence. Questions of law are fully reviewable on appeal, and whether a finding of fact meets a legal standard is a question of law.

*State v. Goebel,* 2007 ND 4, ¶ 11, 725 N.W.2d 578 (citations omitted). "[T]he question whether a suspect was in custody, and therefore entitled to *Miranda* warnings, is a mixed question of fact and law which is fully reviewable on appeal." *State v. Sabinash,* 1998 ND 32, ¶ 14, 574 N.W.2d 827.

■ [¶ 18] In *Miranda,* the United States Supreme Court held, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S.Ct. 1602. Evidence obtained in violation of these safeguards cannot be used against the suspect at trial, except for impeachment purposes. *Harris v. New York,* 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). An individual subject to custodial interrogation is entitled to four warnings to protect individuals from the right against self-incrimination:

[1] He must be warned prior to any questioning that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*State v. Webster,* 2013 ND 119, ¶ 9, 834 N.W.2d 283 (citing *Miranda,* at 479, 86 S.Ct. 1602). Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (citing *Miranda,* at 444, 86 S.Ct. 1602). "A law enforcement officer is required to give *Miranda* warnings only when a person is subject to custodial interrogation. A person is 'in custody' if there is a formal arrest or restraint on his freedom of movement to the degree associated with a formal arrest." *Goebel,* 2007 ND 4, ¶ 13, 725 N.W.2d 578 (citations omitted). "When analyzing whether the accused was in custody, all circumstances surrounding the interrogation must be considered, but the ultimate inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *Sabinash,* 1998 ND 32, ¶ 14, 574 N.W.2d 827. This Court also considers how a reasonable person in the suspect's position would have understood the situation. *State v. Golden,* 2009 ND 108, ¶ 9, 766 N.W.2d 473.

[¶ 19] Rogers argues he was in custody when he confessed to shooting his wife. Rogers contends the totality of the circumstances show he was in police custody from the time officers conducted a welfare check on him at the Days Inn and transported

him to Essentia Hospital where he was placed under a seventy-two hour medical hold. He argues the seventy-two hour medical hold constituted police custody and that his custody continued when he confessed in the interview room at Prairie St. John's. Rogers thus contends his confession should have been suppressed because he was not given his *Miranda* rights while he was in police custody.

[¶ 20] From the record, it is not entirely clear under what authority Officer Ronning was acting when he transported Rogers from the Days Inn to Essentia Hospital for the seventy-two hour medical hold. Also absent from the record are the medical documents admitting Rogers to Essentia and Prairie St. John's. There is some indication Officer Ronning may have been acting under the involuntary commitment statute, N.D.C.C. § 25–03.1–25. However, under the facts of this case, Rogers may also have been committed for seventy-two hours under the public intoxication statute. The statute provides, in part:

A peace officer has authority to take any apparently intoxicated person to the person's home, to a local hospital, to a detoxification center, or, whenever that person constitutes a danger to that person or others, to a jail for purposes of detoxification. A duly licensed physician of a local hospital or a licensed addiction counselor of a detoxification center has authority to hold that person for treatment up to seventy-two hours. That intoxicated person may not be held in jail because of intoxication more than twenty-four hours. An intoxicated person may not be placed in a jail unless a jailer is constantly present within hearing distance and medical services are provided when the need is indicated.

N.D.C.C. § 5–01–05.1. Under this statute, it is clear a licensed physician at a hospital or licensed addiction counselor at a detoxification center has authority to hold an "apparently intoxicated person" in treatment for a period up to seventy-two hours. A person under a seventy-two hour hold is under the medical custody of the hospital or detoxification center, and not the police.

[¶ 21] Regardless of whether the initial admission was under N.D.C.C. § 25–03.1–25 or under N.D.C.C. § 5–01–05.1, under the totality of the circumstances, we conclude Rogers was not in police custody for purposes of *Miranda* when he confessed to killing his wife. There is sufficient competent evidence fairly capable of supporting the district court's findings. Rogers was initially taken to Essentia Hospital in response to his intoxication and a perceived suicidal comment. Rogers was subsequently transferred to Prairie St. John's following a doctor-to-doctor needs assessment between the two hospitals. Law enforcement was not involved in the decision to transfer Rogers, or in the decision to hold him. As the district court stated, "[Rogers] was not free to leave Prairie, but this was based on a doctor's determination. . . ."

[¶ 22] While at Prairie St. John's on the night of February 21, Rogers contacted police to learn the results of his wife's autopsy and to speak with officers. Rogers then went to bed. While he was sleeping, Detectives Loos and Ysteboe went to the hospital to speak with Rogers. Hospital staff woke him up and asked if he wished to speak with police, to which he agreed. The district court found, "While [Rogers] was not free to leave Prairie at the time law enforcement officers came to speak with him, he was free to refuse to speak to them as shown by medical staff only letting the detectives into the facility after [Rogers] indicated that he wanted to speak to them." The medical staff did not

permit the detectives to speak with Rogers until the staff had his permission.

[¶ 23] Hospital staff also selected the room where the interview was conducted. During the interview, Rogers was not handcuffed, and he freely moved about. Hospital staff checked in on Rogers on two separate occasions, and he indicated he was "OK." The district court found, "[Rogers] was not informed that he could leave the room, but [he] could have, as there were multiple doors to which access was not impeded." The court also found Rogers was not placed under arrest until after he was discharged by the medical staff approximately twenty minutes after the interview was completed.

[¶ 24] Simply because Rogers was not free to leave Prairie St. John's does not mean he was in police custody. In *Fields*, this Court concluded a hospitalized motorist was not in custody or deprived of his freedom in any significant way when he was questioned by authorities at a hospital and confessed to causing a car accident. *State v. Fields*, 294 N.W.2d 404, 408 (N.D. 1980). We noted that Fields' detention at the hospital resulted from medical advice, not from any action on the part of the authorities. *Id.* Officers contacted Fields at the hospital as part of an accident investigation, and, if necessary, to conduct a blood-alcohol test. *Id.* "Fields was not taken to the hospital by the officer but by a friend. Officer Heinen's question was asked at the hospital in the presence of this friend and a nurse on duty." *Id.* Given these facts, we held, "Fields's answer was not the result of a custodial interrogation in a police-dominated atmosphere. Thus the failure to advise Fields of his *Miranda* rights prior to asking him if he was the driver of the car at the time of the accident does not make his answer inadmissible. . . ." *Id.*

[¶ 25] The holding in *Fields* follows the general rule that a suspect is not necessarily in custody simply because he or she does not have the ability to leave the hospital. *See State v. Pontbriand*, 178 Vt. 120, 878 A.2d 227, 231 (2005) (stating, "Federal appellate courts and a substantial majority of state courts have found that custody is not established merely because a suspect is unable to leave the hospital due to his or her medical condition."). Thus, whether a defendant is free to leave the confines of a hospital, standing alone, is not dispositive for purposes of determining whether there has been custodial interrogation. *See United States v. Jamison*, 509 F.3d 623, 631 (4th Cir.2007) (holding defendant was not in custody when police questioned him in hospital emergency room following treatment for a self-inflicted gunshot wound); *United States v. Martin*, 781 F.2d 671, 673 (9th Cir.1985) (defendant, who had been making bombs and was injured in explosion, was not in custody when officers went to hospital and questioned him; officers did nothing to bring about or extend his hospitalization); *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir.1994) (defendant was not in custody at the time of the questioning, and defendant was free to check himself out of care center); *People v. Theander*, 295 P.3d 960, 968 (Colo.2013) (defendant was not in custody when she was questioned in hospital for the murder of her husband following her attempted suicide).

[¶ 26] In considering the totality of the circumstances, and how a reasonable person in Rogers' position would have understood his or her position, Rogers was not in police custody when he confessed to the murder of his wife to Detectives Loos and Ysteboe at Prairie St. John's. It is plausible a reasonable person would believe they were free to decline the interview, or to terminate the interview at their choosing. Indeed, hospital staff did not permit the

detectives to speak with Rogers until he consented. Rogers voluntarily spoke with the officers, he was free to move about, the atmosphere of the interview was conversational, and the interview took place in a large, well-lit room far removed from the coercive confines traditionally associated with station-house interviews. Furthermore, during the interview, hospital staff checked on Rogers periodically. Given these facts, the district court did not err in concluding the hospital interview did not constitute a custodial interrogation, and hence, *Miranda* warnings were not warranted.

### III

[¶ 27] Rogers also argues his confession was involuntary. "Voluntariness challenges to statements given to law enforcement officers may be based upon due process grounds or upon self-incrimination grounds." *Sabinash*, 1998 ND 32, ¶ 10, 574 N.W.2d 827. Rogers does not specify under which grounds he challenges the confession. "When a confession is challenged on due process grounds, the ultimate inquiry is whether the confession was voluntary." *Id.* at ¶ 11. Coercion in and of itself does not invalidate a confession, however, a confession is the product of coercion if the defendant's will is overborne at the time the confession is given. *Id.* "Voluntariness is determined by examining the totality of the circumstances surrounding the confession. A voluntariness inquiry focuses on two elements: '(1) the characteristics and condition of the accused at the time of the confession and (2) the details of the setting in which the confession was obtained.'" *State v. Crabtree*, 2008 ND 174, ¶ 12, 756 N.W.2d 189 (citations omitted).

[¶ 28] Looking at the totality of the facts, we conclude Rogers' confession was voluntary. Applying the first prong, the characteristics and condition of the accused at the time of the confession, the district court found, "[Rogers] had taken a sleep aid, but was not otherwise under the influence of drugs or alcohol. [Rogers] indicated that he felt good or fine on more than one occasion." The court also found "[Rogers] denied being suicidal, and any mental health issues he may have been experiencing at the time were not significant enough to delay his release." The court additionally noted Rogers' medical assessments appeared to be in the normal ranges. The court determined there was no indication that the sleep aid Trazadone affected his cognitive abilities. The district court's findings are supported by sufficient competent evidence, as indicated by the testimony of the detectives and Maina.

[¶ 29] The second prong of the inquiry also weighs in favor of voluntariness. Here, the setting was not at the station-house, but instead in a room selected by hospital staff. Detectives were not permitted to visit with Rogers or see him until Rogers gave hospital staff permission. The setting was quiet, and the interview was conversational. Detectives did not exert their control or dominate the setting. Hospital staff checked on Rogers periodically. Police did not control the entry or exit. Rogers also verified at the end of the interview that he was not coerced into making the confession and that his statements were voluntary. Under the totality of the circumstances, we conclude the confession was not compelled, coerced, or involuntary. The trial court's decision was not contrary to the manifest weight of the evidence and the district court did not err in denying Rogers' motion to suppress.

### IV

[¶ 30] Rogers was not in police custody when he confessed to the crimes and his

confession was voluntary. We affirm the criminal judgment.

[¶ 31]   CAROL RONNING KAPSNER, DALE V. SANDSTROM, DANIEL J. CROTHERS, JJ., and GAIL HAGERTY, D.J., concur.

[¶ 32]   The Honorable GAIL HAGERTY, D.J., sitting in place of McEVERS, J., disqualified.