Tufte, Justice.
[¶ 1] Ashley Hunter appealed from a criminal judgment entered after a jury found him guilty of two counts of murder and one count of arson. Hunter argues the district court erred by denying his motion to suppress, the court erred in allowing testimony about his statements to a medical professional, and the judge should have recused himself. We affirm.
I
[¶ 2] On the afternoon of June 22, 2015, Fargo police officers responded to a call about a death at a north Fargo location and found the body of Clarence Flowers. Flowers had been stabbed numerous times. Later that day, firefighters responded to a call about a fire at another north Fargo location and found the body of Samuel Traut. Traut had been killed by blunt force trauma to the head.
[¶ 3] The next morning Fargo police officers were dispatched to an address near the Traut murder scene in response to a call about a suspicious male. When officers arrived at the address, Hunter approached them and was arrested. Hunter was considered a person of interest in the Traut death, but the officers arrested him on a bench warrant for unrelated charges. Hunter was taken to the police station, where he was questioned by Fargo police detectives Matthew Ysteboe and Nick Kjonaas. Hunter made several incriminating statements related to the Flowers and *531 Traut murders. After the interview was complete, Hunter attempted suicide and was taken to the hospital. Hunter was charged with two counts of murder and one count of arson.
[¶ 4] On April 10, 2017, Hunter filed a demand for change of judge under N.D.C.C. § 29-15-21. The court denied the demand for failing to comply with statutory requirements.
[¶ 5] On April 10, 2017, Hunter moved to suppress statements he made to law enforcement after his arrest, arguing the statements were coerced and were not voluntary. He also argued that information obtained from Andrea Wallace, an emergency room nurse, about statements he made to her should be suppressed because Wallace violated the Health Insurance Portability and Accountability Act ("HIPAA") by informing police about statements he had made while he was receiving medical care. After a hearing on Hunter's motion, Hunter filed a supplement to his motion to suppress. He argued his statements to police should be suppressed because he was not given the warning required by Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before he made the statements and he did not knowingly and intelligently waive his Fifth and Sixth Amendment rights. He also argued that any statements he made to medical professionals should be suppressed on the basis of physician-patient privilege.
[¶ 6] On April 21, 2017, the district court entered an order authorizing disclosure of medical information and denying Hunter's motion to suppress his statements made to Wallace based on his HIPAA arguments. The court later entered a second order denying Hunter's motion to suppress the statements made to Wallace based on his physician-patient privilege argument.
[¶ 7] On May 10, 2017, the district court denied the remaining issues raised in Hunter's motion to suppress. The court found Kjonaas gave Hunter the Miranda warning before Hunter was transported to the police station for questioning, Hunter understood the warning, Hunter never invoked his right to remain silent, and Hunter voluntarily spoke to police about the murders. The court concluded Hunter voluntarily waived his right to remain silent.
[¶ 8] On May 12, 2017, Hunter moved the court to reconsider its order denying his motion to suppress the statements he made to police. He argued the statements had been involuntary. The court denied his motion. A nine-day jury trial began on May 22. The jury found Hunter guilty of both counts of murder and one count of arson.
II
[¶ 9] Hunter argues the district court erred in denying his motion to suppress because the State failed to meet its burden to establish he was given a Miranda warning and he did not knowingly and voluntarily waive his constitutional rights.
[¶ 10] We have explained our standard of review for reviewing a district court's decision on a motion to suppress:
When reviewing a district court's ruling on a motion to suppress, we defer to the district court's findings of fact and resolve conflicts in testimony in favor of affirmance. We recognize that the district court is in a superior position to assess the credibility of witnesses and weigh the evidence. Generally, a district court's decision to deny a motion to suppress will not be reversed if there is sufficient competent evidence capable of supporting the district court's findings, and if its decision is not contrary to the manifest weight of the evidence. Questions of law are fully reviewable on appeal, *532 and whether a finding of fact meets a legal standard is a question of law.
State v. Rogers , 2014 ND 134, ¶ 17, 848 N.W.2d 257 (quoting State v. Goebel , 2007 ND 4, ¶ 11, 725 N.W.2d 578 ).
A
[¶ 11] Hunter argues the district court erred by finding he was given a Miranda warning before he was subject to custodial interrogation. He claims the court's finding was based on Kjonaas' testimony that he gave Hunter the Miranda warning at the scene of the arrest, but other evidence indicated Kjonaas was never at the scene of the arrest and there was no other indication from the record that Hunter was ever given the Miranda warning.
[¶ 12] The Fifth Amendment of the United States Constitution provides that no person shall "be compelled in any criminal case to be a witness against himself." In Miranda , 384 U.S. at 444, 86 S.Ct. 1602, the Supreme Court held as a matter of federal constitutional law that "the prosecution may not use statements ... stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." A law enforcement officer is required to give a person subject to custodial interrogation a Miranda warning and inform him of certain rights, including that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has a right to an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning. Id. ; see also Rogers , 2014 ND 134, ¶ 18, 848 N.W.2d 257. The parties do not dispute that Hunter was in custody and subject to custodial interrogation when he made the statements at issue, and therefore law enforcement was required to give Hunter a Miranda warning before questioning him.
[¶ 13] The district court found Hunter was given a Miranda warning after he was arrested and before he was interviewed. The court found that Hunter was arrested on a warrant unrelated to the murder investigations and that officers handcuffed him and placed him in the back of Officer Wes Libner's squad car. The court found Kjonaas walked around the block from the Traut murder scene to the scene of the arrest, spoke to other officers and confirmed Hunter was the person in the back of Libner's squad car, and then gave Hunter the Miranda warning. The court found Detective Matthew Ysteboe testified Kjonaas went to the scene of the arrest and then returned to the Traut murder scene after speaking to Hunter, Ysteboe asked Kjonaas if Hunter had been given Miranda warnings, and Kjonaas said he had. The court found Kjonaas' testimony about giving Miranda warnings to Hunter was consistent with the timeline. The court found Hunter's testimony was credible and was corroborated by Ysteboe's testimony. The court found Hunter was given a Miranda warning.
[¶ 14] Hunter claims the evidence does not support the district court's finding that Kjonaas gave him the Miranda warning while he was sitting in the squad car. Hunter argues the evidence shows he was arrested at 6:34 a.m., the squad car camera video began recording him in the back of Libner's squad car at 6:53 a.m., and the video does not show he was given the Miranda warning. He contends Kjonaas is not listed on the crime scene roster for the scene of the arrest, the squad car recording started immediately after he was seated in the vehicle, and Libner's testimony confirmed Kjonaas was not at the scene of the arrest and so could not have issued the warning.
*533 [¶ 15] Evidence in the record supports the court's findings. Hunter was arrested at 6:34 a.m. on June 23, 2015. Libner testified Officer Cody Gease placed Hunter in the squad car after he was arrested, the video recording in the squad car was started manually, and he could not recall who started the video recording or when it was started. Libner testified he was bagging up Hunter's property while Hunter was placed in the vehicle, he placed the bags containing Hunter's property in the vehicle's trunk, and other officers began arriving at the scene around that time, including officers from the Traut murder scene. There was also evidence that Libner and other officers conducted a security sweep of the surrounding property after Hunter was placed in the squad car. Libner testified he went into the apartment building located near the scene of the arrest so he could speak to the person who called police about Hunter, he spoke with the caller, and he searched a vehicle behind the apartment building before returning to his squad car to drive Hunter to the police station. Kjonaas testified he was at the Traut murder scene around 6:30 a.m. when he heard a dispatch on the police radio to a location that was around the block from the Traut murder scene. He testified he walked around the block and met with other officers at the scene of Hunter's arrest, he confirmed Hunter was in the back of the squad car, and he gave Hunter the Miranda warning. Ysteboe testified he was with Kjonaas at the Traut murder scene, Kjonaas left to go to the Hunter arrest scene, Kjonaas returned to the Traut scene, and Kjonaas told him while they were driving to the police station to interview Hunter that he had given Hunter a Miranda warning.
[¶ 16] The evidence in the record shows there was time for Kjonaas to have given Hunter a Miranda warning after Hunter was arrested and before the squad car video recording was started. Kjonaas' testimony is consistent with the timeline evidence. Although Hunter claims Libner testified that Kjonaas was never at the scene of the arrest and therefore could not have read the Miranda warning, Libner testified at trial that he did not recall having seen Kjonaas at the scene but that it was possible Kjonaas had approached the car when he was away from the vehicle. Kjonaas is not listed on the crime scene roster, but there was evidence the roster did not accurately reflect each time a person entered or left the crime scene. Libner was listed as the "securing officer" on the roster, but he testified the roster was not his and he did not know who had filled it out. Kjonaas testified he did not believe he had entered the crime scene because the squad car was parked on the street, outside what he considered to be the crime scene. The evidence supports the district court's finding that Hunter was given a Miranda warning, and we conclude there is sufficient competent evidence to support the finding and it is not contrary to the manifest weight of the evidence.
B
[¶ 17] Hunter contends, even if Kjonaas read him a Miranda warning while he was sitting in the squad car, officers were required to issue Miranda warnings again at the outset of the interrogation. He contends a warning at the time of the interrogation is indispensable to insure the individual knows he is free to exercise the privilege at that time.
[¶ 18] Hunter does not cite any case law requiring re-administration of the Miranda warning at the beginning of an interrogation if the defendant has previously been given the warning. In Wyrick v. Fields , 459 U.S. 42, 48-49, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982), the Supreme Court rejected a per se rule that a defendant *534 must be re-advised of his Miranda rights after taking a polygraph exam and before he can be questioned about the results. The Court indicated courts should consider the totality of the circumstances in each case to determine whether the defendant has waived his rights. Id.
[¶ 19] Other courts have generally rejected a per se rule about when a defendant must be re-advised of his rights after the passage of time and have held the lapse of time between administration of the Miranda warning and the custodial interrogation or defendant's statement is only one of the factors to consider in determining the validity of a waiver of Miranda rights. See Treesh v. Bagley , 612 F.3d 424, 431 (6th Cir. 2010) ; United States v. Andaverde , 64 F.3d 1305, 1312 (9th Cir. 1995) ; United States v. Thieret , 791 F.2d 543, 547-48 (7th Cir. 1986). Courts have held a lapse of time and a change in conditions similar to those at issue in this case did not require Miranda warnings to be re-administered. See, e.g. , United States v. Rodriguez-Preciado , 399 F.3d 1118, 1129 (9th Cir. 2005) (re-administration of Miranda warning not required when defendant's statements were made 16 hours after the initial warning was given, a different interrogator was questioning him, and there was a change in the location of the interrogation); Andaverde , at 1312-13 (re-administration of Miranda warning not required when warning was given by police two hours before statement to probation officer, there was a ten-minute interval between the police and probation interviews, and the defendant had been moved to a different room); Thieret , at 548 (re-administration of Miranda warning not required before interrogation when defendant had been placed in a holding cell for 40 minutes after he was arrested and the warning was initially given); Stumes v. Solem , 752 F.2d 317, 320 (8th Cir. 1985) (re-administration of Miranda warning was not required when there was more than six hours between warning and waiver). See also Jarrell v. Balkcom , 735 F.2d 1242, 1254 (11th Cir. 1984) (confession was admissible when Miranda warning was given before defendant's arrest, the warning was not given again at the time of arrest, and defendant confessed more than three hours after initial Miranda warning and after the arrest).
[¶ 20] In this case, Hunter was advised of his Miranda rights before he was taken to the police station for the interview. Evidence established Hunter's interview with Kjonaas and Ysteboe began approximately forty-five minutes after Kjonaas read Hunter the Miranda warning and advised him of his rights. The same officer that gave Hunter the Miranda warning also was involved in questioning him. We conclude that under these circumstances the delay after the initial warning and the change in location did not require re-administration of the Miranda warning.
C
[¶ 21] Hunter also argues the statements should have been suppressed because he did not knowingly and voluntarily waive his rights.
[¶ 22] Whether a defendant voluntarily, knowingly, and intelligently waived his rights depends on the totality of the circumstances. State v. Newnam , 409 N.W.2d 79, 83-84 (N.D. 1987). To determine whether statements to law enforcement are voluntary, we consider the totality of the circumstances and focus on two elements:
(1) the characteristics and conditions of the accused at the time of the confession, including age, sex, race, education level, physical and mental condition, and prior experience with police; and (2) the details of the setting in which the confession *535 was obtained, including the duration and conditions of detention, police attitude toward the defendant, and the diverse pressures that sap the accused's powers of resistance or self-control.
Goebel , 2007 ND 4, ¶ 16, 725 N.W.2d 578. A confession may be involuntary even if police have complied with the Miranda requirements. Newnam , at 84.
[¶ 23] The State must show waiver by a preponderance of the evidence. Newnam , 409 N.W.2d at 84. The voluntariness of a confession depends on questions of fact, which are resolved by the district court. Goebel , 2007 ND 4, ¶ 17, 725 N.W.2d 578. This Court gives deference to the district court's determination of voluntariness and will not reverse the court's decision unless it is contrary to the manifest weight of the evidence. Newnam , at 84.
[¶ 24] The district court found Kjonaas gave Hunter the full Miranda warning as required, informing him of all of his rights. The court found Hunter understood the warning, he never invoked his right to remain silent, and he wanted to talk to police about the murders.
[¶ 25] The district court applied the two-part test for voluntariness and found the statements were voluntary. The court found Hunter is a 35-year-old African-American male, his educational background is unknown but he is intelligent, and he has had extensive contact with the criminal justice system in the past. The court found Hunter maintained his innocence for the Flowers murder until the end of the interview and confessed only after officers spoke to another person about the murder. The court found Hunter showed he understood the seriousness of the possible charges when he talked about how much jail time he could receive, he understood the consequences of confessing by asking if he was looking at life in prison, and he voluntarily initiated contact with police that morning. The court acknowledged Hunter gave conflicting stories on his lack of sleep and admitted he had ingested drugs four or five hours before the interview, but the court found Hunter was alert, conscious, and coherent while talking to detectives and he never said he was too tired to continue the interview.
[¶ 26] The court also considered the setting of the interview, its duration and conditions, the attitude of the officers, and whether any coercive tactics were used. The court found Hunter initially approached law enforcement officers to explain that he was innocent, and his long and confusing explanations during the interview showed he wanted the opportunity to present his story to law enforcement. The court found the interview lasted three hours, it was conducted in an interview room at the police station, Hunter was seated close to the door with Kjonaas and Ysteboe across from him, and Hunter was handcuffed and in custody. The court found the officers were calm and spoke to Hunter in a respectful and conversational manner and no physical contact occurred other than the officers responding to Hunter's request to help him rearrange his clothing. The court found the officers employed certain interviewing techniques to question Hunter but none of these tactics went beyond the acceptable range and the tactics would not offend common decency or civilized notions of acceptable practices.
[¶ 27] The district court found Hunter's statements were voluntary under the totality of the circumstances. The court said Hunter's apparent suicide attempt after the interview did not render his statements before the attempt involuntary when all outward indications showed he was stable and wanted to talk. The court concluded Hunter waived his right to remain silent. After examining the entire *536 record, we conclude the evidence supports the court's findings.
[¶ 28] Hunter claims the court erred because it did not properly consider several factors. He contends a valid waiver was impossible because he was not informed of why he was arrested or what he was suspected of and he was not informed of the identities of the interviewing officers.
[¶ 29] In Moran v. Burbine , 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Supreme Court said the Constitution does not require the police to supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or waive his rights. The Court has also said that "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might ... affec[t] his decision to confess.' " Colorado v. Spring , 479 U.S. 564, 576, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (quoting Moran , at 422, 106 S.Ct. 1135 ). In Spring , at 577, 107 S.Ct. 851, the Court rejected the defendant's argument that his waiver was not knowing and voluntary because law enforcement failed to inform him about the potential subject matter of the interrogation. The Court said the defendant's awareness of the possible subjects of questioning was not relevant in determining whether he voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege. Id.
[¶ 30] Although Hunter was arrested on an unrelated warrant, he had voluntarily approached officers, saying without prompting, "I'm the one. I'm unarmed." He explained to the officers he had been framed. After Hunter was placed in the squad car, he began talking about a conspiracy, "the original" and "his woman" who frame people for crimes, and he asked whether officers had talked to a woman inside the building where he was arrested because he claimed she wrote a statement for police. During the interview, Hunter initially raised the subject of the Flowers murder without any prompting from the officers other than their request for Hunter to tell them what had happened the last few days. Evidence established Hunter approached the officers to talk about the murders and to claim he was innocent.
[¶ 31] The officers did not identify themselves at the beginning of the interview, but one of the officers had his badge hanging around his neck. Hunter asked if the conversation was being recorded, and he said to one of the officers, "You're like an FBI agent, right?" Evidence established Hunter understood he was being questioned by law enforcement officers.
[¶ 32] Hunter also argues his mental state was a large factor in determining the voluntariness of his statements. He claims he told the officers he had ingested copious amounts of methamphetamine and had not slept in several days, he requested medical attention multiple times, and his requests were ignored until law enforcement sent him to the emergency room after his interrogation to be medically cleared because of suspected meth use.
[¶ 33] Drug or alcohol use and fatigue are relevant to determining whether a defendant has voluntarily waived his rights, but they do not automatically render a confession involuntary. See United States v. Gaddy , 532 F.3d 783, 788 (8th Cir. 2008). At the start of the interview, the officers asked Hunter whether he was tired and when was the last time he used drugs. Hunter responded, stating he was sleeping and woke up and walked outside. He said he last used drugs four or five hours earlier and his drug of choice was marijuana but he was around people who use other drugs. Kjonaas testified Hunter did not appear to be under the influence of *537 any drugs during the interview despite his claim that he had ingested or used narcotics four hours before the interview, he engaged in dialogue with the officers, he gave narrative answers to the questions asked, and he seemed to understand what the officers said to him. Kjonaas testified Hunter was not significantly impaired based on his statements and conduct during the interview. Evidence established Hunter was sent to the hospital after his interview for jail clearance and a behavioral health evaluation after a possible suicide attempt in which he attempted to put a cord around his neck before he was stopped by officers. At the hospital, Hunter reported to medical staff that he had last used methamphetamine a few days before and regularly uses marijuana three times a day. The medical provider noted Hunter was oriented but agitated, his cognition and memory were normal, and he denied any thoughts of suicide. Hunter was medically cleared for incarceration, but suicide precautions were recommended. The district court found Hunter's exact drug use was difficult to ascertain from the interview, but Hunter was alert, conscious, and coherent throughout the interview. The evidence supports the court's findings.
[¶ 34] After examining the record, we conclude, under the totality of the circumstances, Hunter voluntarily waived his right to remain silent. The evidence supports the district court's findings, and its decision is not contrary to the manifest weight of the evidence. We conclude the district court did not err in denying Hunter's motion to suppress.
III
[¶ 35] Hunter argues the district court erred in admitting the testimony of Andrea Wallace about statements he made at the hospital after he was arrested. He claims waiver of physician-patient privilege must be voluntary under N.D.R.Ev. 510 and he did not waive his privilege.
[¶ 36] The district court has broad discretion in evidentiary matters, and its decision to admit or exclude evidence will not be reversed unless the court abused its discretion. State v. Teggatz , 2017 ND 171, ¶ 8, 898 N.W.2d 684. A court abuses its discretion when it misinterprets or misapplies the law, or if it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process leading to a reasoned determination. Id.
[¶ 37] There was no physician-patient privilege under common law, and therefore its existence and scope depends upon the specific language of the statute or rule authorizing it. State v. Schroeder , 524 N.W.2d 837, 839-40 (N.D. 1994). Rule 503, N.D.R.Ev., states a patient has a privilege to refuse to disclose, or prevent others from disclosing, confidential communications made for the purpose of diagnosis or treatment of the patient's physical, mental, or emotional condition. "[O]nly those communications made 'for the purpose of diagnosis or treatment' are privileged." N.D.R.Ev. 503, explanatory note; see also Schroeder , at 841. The party claiming the privilege and desiring to exclude the evidence has the burden to prove the communications fall within the terms of the statute or rule granting the privilege. See Trinity Med. Ctr., Inc. v. Holum , 544 N.W.2d 148, 156 n.3 (N.D. 1996) ; Booren v. McWilliams , 26 N.D. 558, 145 N.W. 410, 414 (1914).
[¶ 38] The district court denied Hunter's motion to suppress his statement to Wallace. The court found Hunter made the statement while he was being evaluated by a medical professional after an apparent suicide attempt at the police station and his statement was made for purposes of *538 diagnosis or treatment or could be interpreted that way. The court concluded the privilege did apply but had already been waived because Hunter told law enforcement the same information before he told Wallace.
[¶ 39] "We will not set aside a district court's decision simply because the court applied an incorrect reason, if the result is the same under the correct law and reasoning." State v. Cook , 2018 ND 100, ¶ 25, 910 N.W.2d 179. We conclude the court reached the correct result, but for the wrong reason.
[¶ 40] Physician-patient privilege applies only to communications made for the purpose of diagnosis or treatment. N.D.R.Ev. 503. When the statement or communication provided to the physician does not pertain to the patient's diagnosis or treatment, the privilege is not violated by allowing disclosure. In State v. Miller , 530 N.W.2d 652, 656 (N.D. 1995), this Court held a nurse's testimony that the defendant did not consume any alcohol while under her care did not implicate the physician-patient privilege because there was no evidence the nurse's observation was for the purpose of diagnosis or treatment. Other courts have similarly held the privilege did not apply to information that was not provided for purposes of diagnosis or treatment. See State v. Irish , 223 Neb. 578, 391 N.W.2d 137, 142 (1986) (holding doctor's testimony about defendant's statement that he "had been drinking" and "lost control [of his vehicle] and hit the other person headon" was admissible because the communication was not sought for diagnosis or treatment and it was outside the scope of the physician-patient privilege).
[¶ 41] Wallace testified she is a registered nurse and was working in the emergency room the day Hunter was brought in, she went into the exam room to start her assessment and triage, she completed her assessment, and she charted her assessment. She testified there was no conversation between herself and Hunter while she was charting her assessment, Hunter "just started talking" like he "could not be quiet," and he said, "I killed a man last night, and it never should have happened." She testified she had never had something like that happen to her before, she did not ask any further questions, she did not know what to say, she told him she was finished with her assessment and the doctor would be in shortly, and she left the room. Hunter did not make the statement in response to questions from Wallace, and she testified she was finished with her assessment when he made the statement. There was no evidence that his statement was made for the purpose of diagnosis or treatment.
[¶ 42] Hunter failed to establish his statement to Wallace was covered by the physician-patient privilege under N.D.R.Ev. 503. We conclude the district court did not abuse its discretion by denying Hunter's request to exclude the testimony.
IV
[¶ 43] In Hunter's supplemental brief, he claims the court erred by excluding the expert witness testimony of Alan Hirsch. He argues Hirsch is an expert on false confessions, expertise about false confessions has been recognized as a valid social science and necessary tool to help the jury in assessing a defendant's statements, and many courts have allowed expert testimony about false confessions.
[¶ 44] The decision whether to allow expert witness testimony is within the district court's sound discretion, and the court's decision will not be reversed on appeal unless it abused its discretion.
*539 State v. Campbell , 2017 ND 246, ¶ 6, 903 N.W.2d 97. The court has broad discretion to determine whether a witness is qualified as an expert and whether the testimony will assist the trier of fact. In re J.M. , 2013 ND 11, ¶ 11, 826 N.W.2d 315.
[¶ 45] Testimony from expert witnesses is allowed under N.D.R.Ev. 702, which states:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
The Rule envisions generous allowance of the use of expert testimony if the witness has some degree of expertise in the field in which the witness is to testify. J.M. , 2013 ND 11, ¶ 11, 826 N.W.2d 315. The expert does not need to be a specialist in a highly particularized field if the expert's knowledge, training, education, and experience will assist the trier of fact. Id.
[¶ 46] Hunter argued the false confession expert testimony was necessary to aid the jury in accurately assessing the reliability of his statement to law enforcement. He claimed the evidence in the trial had been inconsistent, there was no DNA evidence conclusively linking him to the murders, and the State's case was largely based on his statement to law enforcement. Hunter claimed his expert witness, Alan Hirsch, had specialized knowledge acquired through 30 years' experience in various fields of interrogations and confessions that would be helpful to the jury in understanding his statement to law enforcement.
[¶ 47] The district court allowed Hunter to make an offer of proof and then denied Hunter's request to introduce the testimony. The court explained Hirsch was not a psychiatrist or psychologist or researcher and there was no evidence Hunter had been diagnosed with a personality disorder which might make him more amenable to suggestion. The court found Hunter was offering only general testimony about false confessions, Hunter said the only purpose for calling Hirsch was to put to the jury the notion that false confessions exist, and Hirsch was not going to testify about Hunter or his confession. The district court concluded the existence of false confessions was common knowledge and the evidence would not aid the jury. The jury was instructed that false confessions exist. Hunter failed to present sufficient evidence to establish that Hirsch is an expert and that the testimony would help the jury to understand the evidence or to determine a fact in issue. The district court did not abuse its discretion when it excluded Hirsch's testimony.
V
[¶ 48] Hunter argues his due process rights were violated because the district court judge failed to recuse himself. He claims the judge was biased and it affected his rulings, including his rulings on the Miranda issues and the decisions to exclude expert witness testimony and allow Wallace's testimony.
[¶ 49] On April 10, 2017, Hunter filed a demand for change of judge under N.D.C.C. § 29-15-21, stating he "does not assume any impropriety on the part of any of the preceding Judge just that preconceived notions may be formed regarding the Defendant." On April 12, 2017, the Presiding Judge of the East Central Judicial District denied the demand, stating it did not comply with the North Dakota Century Code.
[¶ 50] Hunter's demand states his motion is in accordance with *540 N.D.C.C. § 29-15-21. Section 29-15-21, N.D.C.C., allows a party in a criminal action to demand a change of judge, but the demand is invalid unless it is filed no more than 10 days after the date of notice of assignment of a judge, the date of notice that a trial has been scheduled, or the date of service of any ex parte order. A peremptory demand for a change of judge may not be made after the judge has ruled upon any matter pertaining to the action. N.D.C.C. § 29-15-21(3). The demand must certify that the judge has not ruled upon any matter pertaining to the action or proceeding in which the moving party was heard. N.D.C.C. § 29-15-21(4). A demand for a change of judge based on bias is different from a peremptory demand under N.D.C.C. § 29-15-21. Gray v. Berg , 2015 ND 203, ¶ 9, 868 N.W.2d 378. A demand for a change of judge based on bias is not subject to the same time constraints as a peremptory demand. Id.
[¶ 51] Hunter's demand cited only N.D.C.C. § 29-15-21, under which the demand was untimely and did not comply with other requirements. If Hunter's demand intended to rely on bias, his allegations in the motion were too vague. He claimed "preconceived notions may be formed regarding the Defendant." That allegation was not sufficient. Knowledge obtained during a judicial proceeding is ordinarily not a basis for disqualification. Rath v. Rath , 2018 ND 138, ¶ 25, 911 N.W.2d 919. On appeal he argues the court's rulings on the Miranda issues, the court's decision to allow Wallace's testimony, and other evidentiary rulings support his claim about bias. His allegations amount to nothing more than dissatisfaction with unfavorable rulings, which is insufficient to demonstrate bias. See Evenstad v. Buchholz , 1997 ND 141, ¶ 11, 567 N.W.2d 194. A ruling adverse to a party does not render a judge biased. Grasser v. Grasser , 2018 ND 85, ¶ 9, 909 N.W.2d 99. Furthermore, the decisions Hunter alleges show bias all occurred after the demand for change of judge. Hunter did not make any further demands for change of judge or motions for recusal related to the alleged bias. Hunter's allegations are insufficient to demonstrate bias. We conclude the court did not err in denying Hunter's demand for a change of judge.
VI
[¶ 52] We have considered Hunter's remaining issues and arguments and conclude that they are either unnecessary to address or are without merit. We affirm the judgment.
[¶ 53] Jerod E. Tufte
Daniel J. Crothers
Lisa Fair McEvers
Jon J. Jensen
Gerald W. VandeWalle, C.J.